REDMOND *v.* STATE *ex rel.* ATTORNEY-GENERAL.*

(Division B.    Oct. 8, 1928.)

[118 So. 360.    No. 27160.]

56

*Corpus Juris-Cyc. References: Druggists, 19CJ, section 2, p. 770, n. 10; Injunctions, 32CJ, section 428, p. 271, n. 53; Nuisances, 29Cyc, p. 1214, n. 70; p. 1221, n. 28, 37; p. 1225, n. 62; p. 1227, n. 67; p. 1228, n. 74; p. 1230, n. 77; Physicians and Surgeons, 30Cyc, p. 1561, n. 32.

*E. L. Dent,* for appellant.

*James W. Cassedy, Jr.,* Assistant Attorney-General, and *E. C. Sharp,* for the state.

Argued orally by *E. L. Dent,* for appellant, and *James W. Cassedy, Jr.,* Assistant Attorney-General, for the state.

ETHRIDGE, P. J. The attorney-general filed a bill for injunction against the appellant, H. R. Redmond, which such he brought on his own relation, alleging that the said H. R. Redmond is now, and for a long time prior to the filing of this petition has been, engaged in the manufacture and sale of drugs, medicines, or nostrums in Covington county, and is also engaged in the practice of medicine in said county; that he is informed and believes that said Redmond is an ignorant and illiterate person of the colored race, with no knowledge or understanding of drugs, or medicines, and is not a qualified pharmacist or physician, and has never passed the necessary examinations to be licensed or permitted to practice either pharmacy or medicine; that he does not possess the character, learning, or training required to pass said examinations, or either of them, or to secure license for the practice of either profession; but that, notwithstanding these facts, Redmond has procured a privilege license

for the practice of medicine in said county, and is daily prescribing and administering drugs to numbers of people, holding himself out to the public as a physician and diagnostician. And he further alleges, on information and belief, that these preparations, which the said Redmond prescribes and administers to the public generally, are manufactured and dispensed under the most unsanitary conditions, the office and manufacturing plant of said Redmond being unsanitary in every respect, while the surroundings of same are such as to constitute a nuisance, detrimental to the health of the community.

It is further alleged that the office and plant aforesaid are located about twelve miles from any town or village, and that large numbers of people of all classes, and afflicted with many dangerous, contagious, and infectious diseases, visit that office and plant daily, and, there being no hospital or housing facilities at or near said office, are thrown together and forced to associate indiscriminately, being brought into contact with infectious and contagious diseases, as appellee is informed and believes, resulting in great danger of epidemics, and the spread of infectious and contagious diseases, and that as a result of the practices and methods of the said Redmond the health of the community at large is endangered, and irreparable injury will follow, should he be permitted to continue the practice of medicine and dispensing of drugs, without first qualifying himself therefor. It is further alleged that appellant (defendant below) is daily violating the rules of the state board of health of Mississippi, although the executive officer of the board has endeavored to put an end to his practice. It is alleged that at the instance of the health authorities of the state a warrant was issued on October 31, 1927, against the said Redmond for practicing medicine without a license, but the case could not be set for an earlier date than November 12, 1927, and in the meantime appellant continued his unlawful practice, defrauding people of large sums of money for

prescriptions, drugs, etc., and appellee further alleges that on information and belief the business and practice of the said Redmond constitute a public nuisance, inimical to the public welfare and health; that appellant is insolvent and irresponsible, and cannot be made to respond in damages; and that appellee and the public generally have no adequate remedy at law.

Appellant further alleges that he filed the petition at the request of the public health authorities of the state, and in discharge of his duty as chief law officer of the state of Mississippi, and prays for injunction to issue without notice and hearing, which injunction was granted by a judge of this court, returnable before the chancery court of Covington county on the second Monday of December, 1927.

An injunction was served, and the appellant, on the 15th day of November, filed a motion to dissolve the injunction, said motion to be heard before the chancellor at the courthouse in Collins, Miss., on Saturday, November 19, 1927. Service was accepted without process, and appellant filed an answer, in which he denied that he was engaged in the manufacture and sale of drugs, medicines, and nostrums, as alleged in the bill; admitted that he is a member of the colored race, but denied that he is ignorant, illiterate, and has no knowledge or understanding of drugs. He admitted that he is not a licensed pharmacist or physician, and has never passed the necessary examination, but denies that he does not possess the necessary character, learning, and qualifications to pass said examinations, and states that at no time, either prior to the filing of said bill of complaint, or since, has he professed to be a licensed physician or pharmacist, and has neither practiced nor attempted to practice either of said professions.

Appellant admits that there was issued in his name a privilege license for the practice of medicine in said county and state, but alleges that it was issued under the

following circumstances, and the privilege license was paid for under protest: On October 11, 1927, a deputy state revenue agent assessed him with a privilege tax from May 1, 1927, to May 1, 1928, in the sum of ten dollars, the amount required under the statute for a duly licensed physician, with a penalty added thereto, as shown by the statement from the state revenue department, attached thereto, marked Exhibit A; that, at the time of issuance of said statement and license, the deputy revenue agent, accompanied by the sheriff of the county, approached appellant in the night, and, though appellant informed them that he was not engaged in the practice of medicine, the deputy revenue agent threatened that if he did not pay for the privilege license he would be arrested and carried to jail, and appellant, being uninformed as to his rights in the premises, paid the ten dollars privilege tax, and the ten dollars damages, as demanded by the deputy revenue agent and sheriff, but under protest; and at no time before or since then has he sought the license of a physician.

The appellant further denies that at any time he manufactured and dispensed drugs under unsanitary conditions, or that his office or manufacturing plant is unsanitary in any respect, or that conditions around his office are such as to constitute a nuisance, and a menace to the health of the community, and further denies that a large number of people are thrown together and forced to associate indiscriminately with persons afflicted with contagious and infectious diseases. He states that he lives on private property, a quarter of a mile, or possibly further, from any public highway; that he has never invited or suggested, or in any way caused, persons, either sick or well, to assemble at his place of business, or elsewhere; that he does not know or believe that any person afflicted with infectious or contagious disease has visited his place of business, and states such charge to be wholly false. He denies, also, that there is great danger of an epidemic of infectious or contagious diseases, or that the

result of his practice and method is dangerous to the public health, or that irreparable injury will be inflicted thereon, should he be permitted to continue to practice medicine or dispense drugs as he is now doing, and further states that he does not, in fact, practice, or attempt to practice, medicine, but, on the contrary, purchases from a reliable, recognized, and lawfully organized wholesale dealer in herbs, Joseph E. Meyer, Indiana Botanic Gardens, Box No. 5, Hammond, Ind. Said herbs sold by wholesale, are clean and pure, free from poisonous and alcoholic substances, and are permitted to be sold under the Pure Food Act of the Federal Government, appellant merely compounding, according to the formula set out on each package of herbs purchased, into a liquid or tea for the purpose indicated in the prospectus and book copyrighted by Joseph E. Meyer in 1922, known as a collection of Botanical Medicines, which appellant will produce on the hearing of this cause to prove that the liquid dispensed is pure, and beneficial to people afflicted with the various ailments set out in the book, many of whom have been restored to normal condition.

Appellant denies that he is daily defrauding the public of large sums of money for prescriptions, drugs, etc., thereby endangering the health and lives of people; denies that he violates any rule of the state board of health, but shows the truth to be that, at the instance of the state board of health, three affidavits were made against him, setting up the same matters contained in the bill, three warrants being issued thereon, and appellant was tried before a justice of the peace of district 4 of said county, and acquitted of said charges. He further alleges, in answer, that proceedings of this kind are covered by chapter 234 of the Laws of 1922, which provides who may commence proceedings in nuisance cases, and how; and this chapter does not include any authority for the attorney-general to proceed as he has attempted to do in behalf of the board of health.

He further denies that he is insolvent and irresponsible, and cannot be made to respond in damages, and denies that appellee and people generally have no full and adequate remedy at law, and alleges that chapter 234 of the Laws of 1922, amending section 2495 of the Code of 1906, as well as chapter 259 of the Laws of 1914, afford a full, adequate, and complete remedy, if the allegations of said bill are true, which appellant denies, and alleges, further, that there is no equity on the face of the bill—that it is insufficient in law, and does not state any cause of action against the defendant.

As to the practice of medicine and diagnosis of the cases of persons applying to him, the proof shows that appellant (defendant below) merely looks at such person, tells him what his disease is, sometimes describing symptoms, and informs him what number of his medicine he should take—each kind of medicine being designated by a number. Should the person desire to do so, he then purchases the medicine at a fixed price. No specific charge is made for the diagnosis of ailments, nor are persons required to pay money therefor. They may, if they so desire, buy the medicine at the same price paid by others, whether previously diagnosed or not. Appellant denies knowledge of *materia medica* and other medical works, but claims that his ability to diagnose the ailments of persons appearing before him is a gift of God. In his testimony he states that he has engaged in this business for a number of years, and that he has traveled with other doctors of this type. In other words, he does not pretend to practice the system of medicine of the ordinary practitioner, and does not follow the methods of medical books in making diagnosis or treating. In reference to the preparation of such medicine as he dispenses, the proof shows that he buys herbs from the source set up in his answer, these herbs being prepared and put up in packages by the Botanical Gardens aforesaid, with directions to boil them in water for a given period of time, after which they are strained

through a cloth into a container, and bottled from this container, either in bottles furnished by the customer or by Redmond.

The testimony for the state as to the surroundings and conditions existing at the place tend to show that it is not clean, one of the doctors testifying that he went there to see Redmond, and was put in the reception room; that the house had some screen wire over it, but the doors were open and there were flies; flies, spiders, and roaches also being in some of the concoctions he saw in one of the rooms, some of which he fished out. He also testified that some of the rooms he went into were filthy; the beds were dirty, without sheets and pillow cases, and in this room he saw a white girl lying on the bed, with another white girl at the head of the bed. When he went into the reception room, he was informed that Redmond had performed an operation for appendicitis; that he thought Redmond came out of this room, but did not see him in the room; that the girl lying on the bed, whom he took for the patient, had off her outer clothing, and her under-clothing was above her knees, and he remarked that it was a shame.

He further testified that there were a large number of people on the grounds on that date, a number of whom he thought to be in the last stages of tuberculosis, and they were coughing and spitting upon the ground. He further testified that the well from which water was taken was drawn by means of hands, pulling a rope to which a bucket was attached; the rope was wet, and was calculated to affect the water supply; that there were a number of people with various diseases, and in a tent on the grounds was a patient who had been operated upon in Laurel, Miss., for tuberculosis of some gland; that flies were around this exposed gland, and about the place, and were liable to infect people; that, when this person was brought from Laurel to the grounds in an ambulance, he saw Redmond get into the ambulance and

take his hand, and thought he was feeling his pulse. This witness further testified that Redmond was an illiterate, typical corn-field "nigger," without learning, and utterly unable to take an examination in medicine or pharmacy.

The county health officers corroborated the testimony of the executive officer of the board of health. He further testified that these concoctions were labeled upon dish-pans and other similar pans—that one pan was marked "syphilis," one "gonorrhea," one "rheumatism," and one "menstruation," spelled in a crude way, and tuber-culosis, not consumption, was spelled wrong; that Redmond admitted to him that he did not have a license, and had no authority from the state; that he asked him where he got his authority to practice medicine, and he said, "from the coperation." It developed that he meant this concern in Indiana. The doctor further testified that in one of the rooms were two colored women, one of whom was youthful, and he asked one of them if she were the wife of Redmond, to which she replied that she was not, and on being asked if she were his daughter, said, "No," she was just his girl.

It was further proven by the state that some of the water used about the place was brought from a creek some distance from the place where the medicines were prepared. Redmond testified that this water from the creek was used to wash the vessels, and things of that kind; that he used water from the well in preparing the medicines. It further appeared in the evidence that, at the place where Redmond stated, patients were treated for appendicitis; the treatment consisting in application of hot cloths to the side of the person affected. It appeared that white women were thus treated by the two white girls employed, and that colored women were treated by the two colored women in a different room; testimony for appellant showing that Redmond was not in the room at the time these applications were adminis-tered, and that he did not personally administer them.

It was shown that a charge of two dollars per treatment was made for this treatment, and that persons giving the treatment were employees of Redmond, being paid by the day or week.

A man by the name of McRaney owned the premises where Redmond's operations were conducted, and had verbally agreed to sell Redmond the grounds upon which he carried on his business, but no deed had been made. The two white girls employed in the establishment were daughters of McRaney, and McRaney himself was employed about the place, they working in the daytime only. There was a tent erected by a negro named Ross—that is, the proof shows that it belonged to Ross, who put up the tent, and that negroes were permitted to sleep therein, but not white people; Redmond's testimony showing that he had no place for people to room, but that other persons operated lunch and cold drink stands upon the premises. The two McRaney girls testified that the premises were clean, and that there had been no roaches or spiders seen at the place since they had worked there.

Other witnesses were examined, many of whom testified that they had bought medicine from Redmond, and that it had proven beneficial to them, and that he had described their symptoms to them exactly. One witness, who was a justice of the peace, in a neighboring county, testified that he had high blood pressure, and was being treated by a regular physician, without any considerable reduction in the high blood pressure, but that he came to Redmond. got some of his medicine, and after taking it reduced his blood pressure from 190 to 140; and that he stands ready and willing for any doctor to test his blood pressure. He gave the name of the physician who tested him, said that he had confidence in the medical doctors, and would patronize them under ordinary conditions, so long as they could successfully treat him; that he had not fallen out with the medical profession, but that he would, if permitted, continue to buy the medicine

which Redmond had sold him, as he felt that the treatment was helping him.

Other witnesses testified that the premises were in good condition; that they regarded them as clean and sanitary. It appeared that there were some three or four closets three hundred or four hundred yards from the place where the medicines were prepared and sold, and that the place was surrounded except on one side, by woods, the nearest residence being something like a mile distant, and a large number of people who visited the place, having occasion to respond to the call of nature, went to the woods. It was further developed in testimony that one of the attorneys for the attorney-general took some samples, and that an examination was made of these medicines. I quote from the record as to this:

"Q. Doctor, did you get a sample of the medicine he sells out there? A. I didn't; Mr. Cassedy did.

"Q. Did you have an examination made of it? A. Yes, sir; I had the state chemist, Dr. Hand, at A. &. M. College; I have a report from the state chemist and Dr. Hand of the analysis of three bottles.

"Mr. Dent: We object to that. Overruled. Exception. (Here copy the report of Dr. Hand and also the report of the state chemist.)

"Q. Now the absence of alkaloids and metallic salts would indicate what? A. That it has no medicinal value whatever.

"Q. What does he mean by saying that it contains colon bacillus? A. It means that this medicine is polluted by fecal matter.

"Q. Is that detrimental to the human system? A. Yes, sir; it is; where you find colon bacillus, you will usually find typhoid germs.

"Q. What does the state board of health do where conditions like that are found? A. The place is condemned. Even cold drinks are not permitted to be sold under conditions like that under which this is sold as a medicine.

"Q. Is this 'Dr. Redmond' what is generally known as a nigger? A. Yes, sir; he is a typical Southern cornfield nigger.

"Q. Would you say he is ignorant or educated? A. He is very ignorant."

The record does not show any formal offer in evidence of a certificate from the state chemist, Dr. Hand, or by the chemist of the state board of health, and no copy is made of any such report. The record does not show that they were introduced in evidence, and the objection being made to their contents, and the meaning of the contents, and as the doctor testifying is not shown to have made the examination, were improperly admitted, and have no evidentiary value. It is not shown that there were actually typhoid germs, either in the medicine, or anywhere, or in the water used, or that any person was infected by contagious disease on the premises.

On these facts, the question arises: First, was Redmond engaged in the practice of medicine under the circumstances disclosed above? Second, was he engaged in the practice of pharmacy in preparing the medicines in the manner above indicated? And, third, if so, in either case, is injunction the remedy? Section 7452, Hemingway's Code of 1927, defines the practice of medicine as follows:

"*Practice of Medicine Defined.*—The practice of medicine shall mean to suggest, recommend, prescribe, or direct for the use of any person, any drug, medicine, appliance or other agency, whether material or not material, for the cure, relief, or palliation of any ailment or disease of the mind or body, or for the cure or relief of any wound or fracture or other bodily injury or deformity, or the practice of obstetrics or midwifery, after having received, or with the intent of receiving therefor, either directly or indirectly, any bonus, gift, profit or compensation," etc.

It will be seen from this section that the practice of medicine is:

"To suggest, recommend, prescribe, or direct for the use of any person, any drug, medicine, appliance or other agency, whether material or not material, for the cure, relief, or palliation of any ailment or disease of the mind or body, or for the cure or relief of any wound or fracture," etc., "after having received, or with the intent of receiving therefor, either directly or indirectly, any bonus, gift, profit or compensation."

The appellant contends that he was not engaged in the practice of medicine, because he did not charge for the diagnosis or description of the disease or symptoms thereof, but that he relied entirely upon the sale of the medicine for his money, and that the medicine was sold alike to every person, whether they had the diagnosis made or not; that consequently there was no question of receiving any reward, or any intention of receiving one.

Taking the situation as a whole, and considering it altogether, we are satisfied that the description of symptoms and the telling the proposed customer that a certain number of the medicine was good for his disease, or would cure or palliate it, constitutes a practice of medicine within the statute. Without the diagnosis or description of symptoms, and recommendation of the remedy, the appellant must have known that few sales would be made; whereas, if he described the symptoms, or pronounced the affection a given disease, and prescribed the remedy for it, the inducement was great on the person so affected to buy and try the remedy. It is, therefore, a great inducement to the sale of medicine, and this was, of course, known to Redmond, and he no doubt made the diagnosis with the expectation that it would be followed by a sale of medicine, and such was the case in at least a large percentage of the people who applied to him.

Under the statutes, the medicine need not be a drug, if it is a medicine; that is, it need not be any standard drug used in the pharmacopœia, or used by druggists and physicians, so long as it is a healing agency, and claimed

to be, and sold for profit, or with the expectation of' receiving a profit. We are therefore of the opinion that the business as conducted is the practice of medicine. True, it is not the same kind of medicine, and it is not the same kind of practice and procedure that is usually followed by physicians. The statute was intended to guarantee suitable persons for the practice of this art of healing and dispensing of medicine and drugs, and to insure that they had sufficient knowledge of drugs and disease to make them useful, rather than dangerous agencies to people.

The statute on pharmacy (chapter 164, Hemingway's Code of 1927; section 3667 of the Code of 1906), and amendments thereto, and additional statutes embraced in various laws, do not define in what the practice of pharmacy consists. The concluding section, 7436, of Hemingway's Code of' 1927 (chapter 114 of the Laws of 1916), provides that nothing in this act shall be construed to prohibit the sale of patent or proprietary medicines sold by dealers, merchants, or agents not licensed throughout the state.

As we understand pharmacy, as used within this statute, it is the preparation of medicine in filling the prescriptions of physicians, and the compounding and preparing of such drugs as are usually dangerous to be handled or prescribed by those not versed in the properties of drugs, and the nature and character of diseases for which drugs were prescribed. We do not think it is intended to prevent the preparation of teas from herbs, such as were formerly quite largely used in the country, and whose properties and tendencies were well known. It does not intend to prevent the making of these teas and preparations, or the administering of the ordinary proprietary medicines to persons, or the selling of them, and, consequently, we do not think that the making of these so-called medicines constitutes an engagement in pharmacy. These preparations were put up under a

patent or copyright, and directions were given for their preparation, and they were sold, according to the proof, to any person who applied for them. In other words, any person could buy from the Botanical Gardens, and prepare the teas from these herbs in accordance with directions. The proof in this case does not show that these medicines contained any substance deleterious or dangerous to life and health. The most it has shown is that they are harmless and valueless. Of course, medicine is not an exact science, but is rather an experimental one. However, the chemical processes used in analyzing these various things are able to detect any dangerous substances or agencies in such preparations, and the record does not show with any certainty at all that these preparations are dangerous when taken in the manner directed in selling them.

The question occurs then: Is injunction an available remedy to prevent the practice of medicine? The legislature has not provided that injunction is a remedy in such cases. It prescribes a punishment for those engaging in the practice of medicine without procuring a license to do so, in the manner pointed out by the statute.

The common law did not require examinations, and the practice of medicine was open to all people who desired to practice it, subject to liability for damages for lack of skill, and to the right of the government to proceed by *quo warranto* to prevent incompetents from following the business. However, the states have practically all prescribed conditions governing its practice, with the intention to secure the necessary knowledge and skill in physicians. The state has, therefore, made it a franchise or privilege, which can be exercised only upon conditions which the state has prescribed, having in view the general welfare and safety of the community.

In 22 R. C. L., p. 656, *quo warranto* is defined as follows:

"The ancient writ of *quo warranto* was in the nature of a writ of right for the king against one who claimed or usurped any office, franchise or liberty, to inquire by what authority he asserted a right thereto in order that it might be determined. As otherwise expressed, it is a writ which the state may issue at will and of right. It is a demand made by the state upon some individual, to show by what right he exercises some franchise appertaining to the state, which, according to the constitution and laws of the land, he cannot legally exercise, except by virtue of some grant of authority from the state. The writ of *quo warranto* was a common-law process of such antiquity that the precise date of its appearance is unknown."

In 23 A. & E. Ency. of Law (2 Ed.), under definition, "Scope of Title," it is said:

"In its broadest sense, *quo warranto* may be defined as a legal proceeding to determine the right to an office or franchise, and to oust the defendant therefrom if his title is found to be fatally defective."

And under heading, "Nature and Origin of Remedy," on the same page:

"Originally at common law the writ of *quo warranto* was a writ in the nature of a writ of right for the crown against the usurper of an office or franchise, whereby the authority of the usurper was inquired into and the right determined. It commanded the respondent to show by what authority—*quo warranto*—he assumed to exercise the office of franchise, having never had any grant of it or having forfeited it by neglect or abuse. The writ is a very ancient one. The earliest instance of its use appearing of record is said to have been in 1198, during the reign of Richard I. The writ was much abused, and became a powerful instrument in aid of the encroachments of the royal prerogative. These abuses were checked and the use of the writ regulated by the statutes of *quo warranto* enacted during the reign of Edward I."

At an early day, the time of which cannot be precisely determined, the writ of *quo warranto* fell into disuse, and its place was taken by an information in the nature of *quo warranto,* which is now the exclusive remedy in England and in most of the states of the Union. In the United States the terms *"quo warranto"* and "information in the nature of *quo warranto"* are generally, but not always, used as wholly synonymous terms. The information lies in all cases where formerly the writ would have issued, and, in the absence of constitutional or statutory provisions, in no other cases.

In the absence of statutory provisions the common-law remedy by information in the nature of *quo warranto* is the proper remedy on appropriate cases. But statutory relations exist very generally in the several states. In some states an ordinary civil action serves the purpose of the former writ of information, both the writ and the information being sometimes expressly abolished. In *Lindsey* v. *Attorney-General,* 33 Miss. 508, the following principles were announced in the case, as shown by the syllabi thereof:

"1. At common law the writ of *quo warranto* is in the nature of a writ of right for the king, against him who claims or usurps an office, franchise, or liberty, to inquire by what authority he supports his claim, in order to determine the right. See 2 Black. Com. 262; 7 Comyn's Dig. 190.

"2. Owing to the great length of the process, and the delay occasioned by the practice which prevailed under it, the ancient writ of *quo warranto* has fallen into disuse, and the more modern method of proceeding, by information in the nature of a writ of *quo warranto,* in the name of the attorney-general, substituted; and now this latter proceeding can be supported in all cases in which the ancient writ was maintainable.

"3. In ascertaining the nature and extent of rights, and the appropriate remedies to enforce them, we may

look to the rules of the common law; but, in determining the tribunal in which a specific remedy is to be enforced, we must look alone to our own Constitution and laws; and therefore, although by the common law of England the writ of *quo warranto* might have been grantable only at the pleasure of the king, yet being an appropriate remedy to enforce certain legal rights, it will be granted by the common-law courts of this state. . . .

"5. The attorney-general is the proper officer in whose name an information, in the nature of a writ of *quo warranto,* should be prosecuted, in order to award to the relator the enjoyment of an office improperly withheld from him."

We think, then, that a *quo warranto* in the circuit court is the proper remedy to pursue, when a person is practicing medicine without having obtained a license in the manner required by law, and that court is competent to adjudge the matter, and award appropriate relief. In this connection we desire also to call attention to section 156 of the Constitution of Mississippi of 1890, providing that the circuit court shall have original jurisdiction in all matters civil and criminal in this state, not vested by this Constitution in some other court. The jurisdiction here involved is not vested in any other court, and consequently the circuit court has jurisdiction thereof. And the statute, furthermore, gives the circuit court jurisdiction of *quo warranto*.

The attorney-general seeks to proceed, however, on the theory that the practice of medicine without a license is a nuisance, and seeks to invoke the aid of equity and the doctrine of nuisance. It is certainly not a nuisance, *per se,* to practice medicine. It was not a nuisance at common law, but was a privilege available to all persons until statutes were passed, requiring education and preparation for the exercise of that profession. Generally the proper method at common law was to proceed in the law courts. In 14 Enc. Pl. & Pr., p. 1105, it is said:

"*In general.*—Actions at law to abate nuisances are cognizable in courts of general original jurisdiction. Indeed, it is only in such courts that such actions lie, in the absence of constitutional or statutory provisions. designating other courts into which they may be brought. And it has been held that a constitutional provision giving cognizance of an action to abate a nuisance to a court of limited jurisdiction does not oust the jurisdiction of a court of general jurisdiction, but makes it concurrent."

At page 1118, 14 Enc. Pl. & Pr., it is said:

"The jurisdiction of equity courts to grant relief by injunction, in proper cases, against nuisances, either public or private, is undoubted and well settled; and wherever the circumstances of the case are such that adequate redress cannot be obtained elsewhere, equity will afford relief."

At page 1120, 14 Enc. Pl. & Pr., it is said:

"But the equitable jurisdiction over nuisances is not an original one. It does not arise from the mere fact that a nuisance exists, but results from circumstances which call it into exercise upon other grounds, as, for example, to restrain irreparable injury, to suppress interminable litigations, or to prevent a multiplicity of suits. A case of actual and pressing necessity must be shown before an injunction will be granted, and, where it does not appear that such a drastic remedy is required by the circumstances of the case, it is the duty of a court of equity not to interfere.

"*Power Cautiously Exercised.*—While, as has been stated above, the power of a court of chancery to interfere by injunction in cases of nuisance is clearly established, still it is one of the extraordinary powers of the court and should be cautiously and sparingly exercised; and before an injunction is granted against a nuisance the complainant should be required to make out a clear case, showing that he is entitled to such relief."

In *Green* v. *Lake,* 54 Miss. 540, 28 Am. Rep. 360, the rule is laid down as follows:

"To restrain by injunction the use of property by the owner, on the allegation that such use will be an annoyance and injurious to the property of another, is a very delicate branch of chancery jurisdiction. The law characterizes certain uses of property in a crowded city as nuisances *per se,* while others may become nuisances, though the use itself is lawful. A corn and flouring mill is not *per se* a nuisance in a city. Generally a court of equity will refuse relief until the complainant has established at law the existence of the nuisance, and will not act if his right is controverted or not clear."

See, also, *West* v. *Ponca, etc., Co.,* 14 Okl. 646, 79 P. 100, 2 Ann. Cas. 249, and case note.

A person might acquire the very greatest learning and skill in medicine, and might practice most usefully upon people in cases calling for that skill, and still not be a licensed physician. Under present conditions, a person must have a given education from a recognized source before he is permitted to be examined for the practice of medicine at all. Of course, knowledge can be acquired and great skill can be attained therein, without going through this prescribed formula. A person may, without attending a medical school, attain the highest learning in this subject, if he has sufficient education to understand the language and terms used, and is diligent enough to pursue that study. Consequently, whether a man is examined by the board, or not, does not, of itself, furnish the requisite skill and knowledge. Therefore such practice of medicine is not a nuisance *per se,* and if a nuisance at all, would be made such by the manner in which it is pursued.

We do not think that the case here presented makes a case within the authorities upon the subject, although there is some authority to the effect that exercising a calling, or violating the law in pursuing it, is in itself

sufficient to constitute a nuisance. The overwhelming and better authorities are to the contrary.

"It may be laid down as a generally accepted rule of law that a hospital, whether for treatment of ordinary diseases or for treatment of contagious and infectious ones, is not a nuisance *per se,* though it may become such by reason of the place of its location or because of the manner in which it is conducted." 29 L. R. A. (N. S.) p. 49, note.

See, also, *Barry* v. *Smith,* 191 Miss. 78, 77 N. E. 1099, 5 L. R. A. (N. S.) 1028, 6 Ann. Cas. 817, and case note thereto, at page 823, and case note to 15 Ann. Cas. 719.

In *Lorenzi* v. *Star Market,* 19 Idaho, 674, 115 P. 490, 35 L. R. A. (N. S.) 1142, it was held that the smoking of meats, rendering lard, and manufacturing of sausages, and other meat products, is not *per se* a nuisance, and where the city authorities have not prescribed any limits within which such business shall be carried on, or prohibited the carrying on of such business within any part or portion of the city, it is not *per se* a nuisance to carry on such business at any place within the city, and it only becomes a nuisance to do so by reason of the particular facts of any specific case, and the manner and method of conducting the business at such place.

We think the facts disclosed in the record, taking the testimony in its most favorable light as to the contention of the state, do not make the business conducted a nuisance *per se.* There must be something more than the mere possibility of an injury. There must be a condition in which it is shown as a fact that the public health is actually jeopardized, and that contagion exists. The mere possibility of the contracting of disease by people, or that the place is not as sanitary as might be desirable to have it, is not sufficient; but the condition must be such as to render it legally certain that the public, as distinguished from a mere particular individual, will be materially damaged in all probability.

In dealing with this question, we must bear in mind that the board of health has jurisdiction of a great many places of business, which may, or may not, become nuisances, or dangerous to health, as they are operated. In such cases it is much safer to follow the statute, chapter 234 of the Laws of 1922, which provides a legal method, and which safeguards both the public and private individuals by its procedure and requirements. This statute reads as follows:

"Section 1. That section 2495 of the Mississippi Code of 1906 be and the same is hereby amended so as to read as follows: . . .

"*Nuisance.* The state board of health, when informed by a county health officer, or otherwise, of the existence of any matter or thing calculated to produce, aggravate, or cause the spread of any epidemic or contagious disease, or to affect injuriously the health of the public or community, may declare the same a nuisance, and when it does so, it shall notify the district attorney, county attorney, municipal attorney, county health officer, municipal health officer or town marshal, of the district where the nuisance exists, who shall forthwith commence proceedings by information in the circuit court to have the same abated, and the parties in interest shall have five days' notice of the proceedings, which shall be served as in ordinary suits. Such proceedings may be tried by the judge, in term time or in vacation, in a summary way, and if the matter be urgent, it shall be tried without delay; but the parties in interest shall have a jury if they demand it, which the judge shall cause to be summoned, if in vacation, returnable at some early day, to be fixed by him, and the matter shall be tried as other causes by judge and jury; and if the matter be found to be a nuisance, the judge shall order the same abated, which shall be executed by the sheriff or other proper officer, and an appeal shall not be allowed therefrom. This section shall not affect the right which municipalities may have to

abate a nuisance, or common law or equity proceedings for that purpose.''

It is a general rule that equity will not resort to the extraordinary remedy of injunction where there is an adequate legal remedy, but will leave the parties to follow the legal remedy. The statute above quoted provides for an inspection of the place or business by a member of the state board of health, and if they shall, after examining the same, conclude that it is calculated to produce or cause the spread of any dangerous disease, or affect the health of the community, may declare the same a nuisance. When he does so, he notifies the district attorney or other authority, who shall commence proceedings, by information in the circuit court to have the same abated. The parties interested have five days' notice of proceedings, and the proceedings may be tried in term time or in vacation in a summary way, and, if it be urgent, without delay. But the parties in interest shall have a jury if they demand it, which shall be summoned, and may be returnable in vacation on a day fixed by the judge, and shall be tried as in other cases by judge and jury. If the matter be found to be a nuisance, it shall be abated.

As stated, this act is effective, and furnishes a remedy, one that safeguards the rights of everybody, and one that was proceeded with in all essentials in the manner prescribed, except that the suit was brought in the chancery court, seeking an injunction, probably to avoid a trial by a jury. In such cases, depending on questions of fact, as to being a nuisance or not, according to the facts established by evidence, it is highly important to the rights of the citizen that he have a jury pass upon the facts. The jury trial is a valuable right. It guards against injustice, prejudice and similar things.

The facts in this case, in our opinion, make it particularly one to be dealt with under the provisions of this chapter. A jury was demanded in the chancery court, and refused. The facts are barely sufficient, taking the

most favorable view for the state, to establish a nuisance. A jury trial was vital to defendant's rights, and should not have been denied him.

It is a delicate, though often a necessary, thing to condemn a business operated by a citizen. It may result in great loss, or even ruin, to his business. The legislature, realizing the delicacy of the power conferred, and at the same time recognizing its necessity in proper cases, has provided a jury, and the cause should have been proceeded with under that statute. It follows that the chancery court had no jurisdiction to entertain the bill and grant the relief prayed, and judgment will be reversed, and the bill dismissed. But proceedings can be instituted in the circuit court under this chapter, and the matter be determined in accordance with its provisions.

*Reversed, and the bill dismissed.*