364 So.2d 1084 (1978)
L. Alfred NORVILLE, Jr.
v.
Mississippi State Medical Association.
No. 50371.
Supreme Court of Mississippi.
July 26, 1978.
Rehearing Denied December 13, 1978.
Abe A. Rotwein, Jackson, for appellant.
Wise, Carter, Child, Steen & Caraway, James K. Child, Jr., J. Leray McNamara, Jackson, for appellee.
Before SMITH, WALKER and COFER, JJ.
WALKER, Justice, for the Court:
This is a suit to enjoin a chiropractor from the practice of medicine without a license. Suit was brought in the Chancery Court of the First Judicial District of Hinds County, Mississippi by the Mississippi State Medical Association against L. Alfred Norville, Jr. The court granted partial relief and issued a permanent injunction prohibiting Norville from prescribing, recommending or suggesting vitamins and food supplements for use by his patients and prohibiting the use of microwave diathermy machines, ultrasonic devices, and electric muscle stimulators.
The case presents three issues:
(1) Whether the use of microwave diathermy machines, ultrasonic devices and electric muscle stimulators by a chiropractor constitutes the unlicensed practice of medicine?
(2) Whether prescribing, recommending or suggesting use of vitamins by a chiropractor constitutes the unlicensed practice of medicine?
(3) Was the petitioner, Mississippi State Medical Association, required to prove irreparable harm and lack of an adequate *1085 remedy at law before an injunction could issue?
The Mississippi State Medical Association, at the 1975 annual meeting of its House of Delegates, approved a resolution to initiate legal action against chiropractors who violate the Chiropractic Licensing Act resulting in unlicensed practice of medicine. Subsequently the executive secretary of the Mississippi State Medical Association selected Norville as a defendant and employed counsel to file suit. The suit was for injunctive relief. Defendant generally demurred to the bill on the grounds that there was no equity on the face of the bill; that it did not state a cause of action; that there existed a proper remedy at law, and that complainant was not a proper party to bring suit and therefore lacked standing. The demurrer was overruled and the cause set for trial.
At trial, Norville admitted that he prescribed vitamins for his patients and kept a supply for sale in his office. He further stated that his use of vitamins was for the purpose of relieving ailments or disease and that he prescribed vitamins in ninety to ninety-five percent of his cases. Similarly, Norville admitted the use of ultrasound, microwave, and electric muscle stimulators in ninety to ninety-five percent of his cases. He testified that the modalities were used to relieve an ailment or treat a disease; however, at another joint he had testified they were used to facilitate spinal adjustments.
Photographs of the vitamins involved were introduced into evidence. There were some eighty-one different types of vitamins and food supplements involved, but all were of the type which can be purchased in stores without prescription. The modalities prohibited were ultrasound, microwave diathermy, and electric muscle stimulator. Dr. Wharton, an orthopedic surgeon and chief of the spinal injury service at Methodist Rehabilitation Center testified that microwave diathermy is a form of treatment which concerns the use of radio waves in the microwave spectrum. These microwaves have the capability of developing heat or translating the energy of radio waves deep within the body or at least deeper than the superficial layers of skin. The purpose of microwave diathermy according to Dr. Wharton is to produce heat deep within the body and by doing so to increase blood circulation in that particular area. He also testified that if overheating occurs, tissue necrosis (death of the tissue) can occur. He further testified that in his opinion it was possible to cause death with the use of diathermy.
Ultrasound, according to Dr. Wharton, is energy in the form of a sound frequency. The ultrasound equipment can cause changes in the temperature of tissue and the purpose is to alter temperature selectively. As with microwave diathermy, it also produces some degree of increased circulation. According to Dr. Wharton, ultrasound penetrates more deeply than microwave diathermy. Among other dangers of the use of ultrasound, Dr. Wharton pointed out that if used in an area of an underlying tumor, the vibratory form of energy may spread malignancies through the bloodstream. A similar effect may occur if used over an area of infection.
Electrical muscle stimulators are used to transmit a low voltage current through the skin, generally to trigger points in a muscle near the junction of nerves and muscle tissue thereby causing the muscle to contract. Dr. Wharton testified that he knew of no circumstances where a muscle stimulator would be used with regard to the spine or spinal column.
Several physicians testified that ultrasound or microwave diathermy were used only in fairly rare circumstances and only after other forms of treatment had proven ineffective. Photographs of these three modalities were introduced into evidence. All three machines bore plates warning that the machines were sold only for use by or under the direction of a qualified physician or by a person licensed by state law to use such machines.
DIATHERMY
Federal law restricts the sale of this device for use by or on the order of a *1086 physician or any other practitioner licensed by the law of the state in which he practices to use or order the use of this device.
The manufacture, use and sale of this equipment is licensed by Raytheon Company
ULTRASOUND
Federal law restricts this device to sale by or on the order of a qualified physician or other qualified practitioner licensed by the law of the state in which he practices to use or order the use of this device. Licensed under U.S. patents of A.T.&T. Co. and Western Electric Co., Inc. for therapeutic generators. Other patents pending. Federal Communications Commission type approved.
ELECTRIC MUSCLE STIMULATOR
WARNING: This device is sold only for use by or under the direction of a qualified physician. The observance of safe and established medical practices is essential to its proper use. Otherwise there are possibilities of injury to patients or operators.

MAJESTIC INSTRUMENTS

I.
(1) Does use of the modalities microwave diathermy, electrical muscle stimulators and ultrasound equipment constitute the practice of medicine?
(2) If so, is use of such equipment permitted by the Chiropractic Licensing Act?
The practice of medicine is defined in Mississippi Code Annotated section 73-25-33 (1972) as:
The practice of medicine shall mean to suggest, recommend, prescribe, or direct for the use of any person, any drug, medicine, appliance, or other agency, whether material or not material, for the cure, relief, or palliation of any ailment or disease of the mind or body, or for the cure or relief of any wound or fracture or other bodily injury or deformity, or the practice of obstetrics or midwifery, after having received, or with the intent of receiving therefor, either directly or indirectly, any bonus, gift, profit or compensation; provided, that nothing in this section shall apply to females engaged solely in the practice of midwifery.
Defendant Norville admitted that he prescribed or directed the use of these modalities for the cure and relief or palliation of ailment or disease of the body with the intent to receive compensation therefor. Thus, there is no question but that such use of the machines constituted the practice of medicine.
The question remains, however, whether such use is protected or allowed under the Chiropractic Licensing Statute, Mississippi Code Annotated section 73-6-1 to 73-6-31 (Supp. 1977). Section 73-6-1 defines the practice of chiropractic as:
The practice of chiropractic involves the analysis of any interference with normal nerve transmission and expression, and the procedure preparatory to and complementary to the correction thereof, by an adjustment of the articulations of the vertebral column and its immediate articulations for the restoration and maintenance of health without the use of drugs or surgery.
If the use of such instrumentalities is allowed by the statute, then they must come under the phrase "procedure preparatory to and complementary to ... adjustment of the articulations of the vertebral column." The appellant at one point testified he used diathermy and ultrasound to relax patients prior to making adjustments and electrical muscle stimulators to "free infringed nerves" prior to making adjustments. While there was contradictory testimony on the purpose of use of modalities, nevertheless assuming the above purposes, the question still remains whether the legislature intended such use to be covered. The chancellor construed the phrase as not including use of such modalities. We agree.
Prior to the passage of the Chiropractic Licensing Act of 1973, this Court had upheld the conviction of a chiropractor for the illegal practice of medicine who had attempted to remove tonsils by inserting a *1087 needle and applying electric current. Joyner v. State, 181 Miss. 245, 179 So. 573 (1938). In affirming the decision, the Court did not dwell on the use of the needle as such but rather discussed the use of electrotherapy in the general sense. The Court stated:
But the treatment of disease by the use of surgical instruments and other appliances, as distinguished from treatment by hand ... and treatment by means of electricity, known as electrotherapy, are methods commonly adopted by physicians and surgeons, as taught in their institutions, established by their highest authorities in the field of surgical and medical science, and, by general acceptation, regarded as pertaining peculiarly to those professions.

Electrotherapy is defined in medical jurisprudence as the use of different forms of electric machines for therapeutic purposes, and before an electrotherapist can follow his profession he must obtain, at least in some states, a license authorizing him to practice in that particular field. This practice has not been recognized in our state as a distinct science, separate and apart from the field of medicine or surgery;[1] and, since the use of electrical appliances for the treatment of disease is ordinarily regarded as pertaining to these particular fields, it is not lawful to engage in the practice of these methods without being licensed as a physician and surgeon. (Emphasis added). 181 Miss. at 252, 179 So. at 576.
The Court went on to hold that "Appellant was authorized to practice chiropractics under his license (privilege license) issued to him by this State, but not to engage in the use of any methods pertaining to the practice of medicine and surgery." In so holding, the Court cited State Board of Medical Examiners v. De Baun, 7 N.J. Misc. 1040, 147 A. 744 (1929). There, the defendant chiropractor explained his use of the electrical apparatus as "a galvanic current producing heat for relaxation" which is the argument of Norville in the case at bar. The Court in De Baun rejected this contention stating that:
Electricity is a dangerous instrumentality with the ever present capacity to do serious bodily harm unless restrained within proper limitations. It is essential that its use as applied to the human body should be under the direction of authorized persons. Its use in the instant case was a part of the art of healing. The specific use above referred to in no wise involved the function of hand manipulation. We are unable to conceive of any hypothesis in the proofs in the case upon which the use of electricity in the manner stated is a part of the practice of chiropractic... . (147 A. at 744-45).
Thus, it is clear that absent an intent on the part of the legislature to broaden the preexisting scope of chiropractic practice, the contention of appellant must fail. No such intent expressly appears in the licensing statute.
Moreover, we are influenced by the consideration that where in the Chiropractic Act, practitioners are allowed to use equipment capable of causing bodily harm, e.g., x-ray machines, such use was allowed only with stringent educational requirements, e.g., "... forty (40) clock hours of instruction in the operation of X-ray machinery and not less than forty (40) clock hours of instructions in X-ray interpretation and diagnosis." Furthermore, provision is made for examination concerning knowledge of and use of x-ray machines. Mississippi Code Annotated section 73-6-13 (Supp. 1977). In contrast, no provision was expressly made for use of diathermy, ultrasound or electrical muscle stimulators, nor is there any educational requirement for classes in such machines. The testimony at *1088 trial indicated such machines were capable of causing bodily harm. It seems likely that if the legislature intended that chiropractors be allowed to employ these hazardous modalities in the treatment of their patients, it would have provided for substantially the same safeguards that underlie use of x-ray machines.
All of the witnesses agreed that the disputed modalities can be dangerous if improperly used or if used when contraindicated. Doctors George Wharton and George Purvis both testified that it is necessary to rule out infections and malignancies in the areas to be treated before using diathermy or ultrasound, as treatment with these modalities might cause the malignancy or infection to spread. Both testified that if a surface examination indicates the possibility of a malignancy or infection, it may be necessary to obtain a tissue sample or to use a needle to draw out any fluid that might be present in the potentially infected area and have that analyzed by a laboratory. By appellant's admission, the taking of tissue samples or fluid is outside the scope of his practice as described by the State Board of Chiropractic Examiners and we are not persuaded that the presence of malignancy or infection can be ruled out by the other diagnostic procedures employed by appellant.
Given the prior ruling in Joyner that electrotherapy constituted the practice of medicine and was not a part of chiropractic, coupled with the failure of the legislature to expressly allow use of and set up educational requirements for use of these modalities and since the testimony showed them to be capable of causing harm if improperly used, we must conclude the use of such modalities is prohibited to chiropractors.

II.
(1) Does prescribing, recommending or suggesting the use of vitamins for patients constitute the unlicensed practice of medicine?
(2) If so, is such protected under the Chiropractic Licensing Act?
Appellant admitted that he recommended or prescribed vitamins and food supplements for use by his patients to cure their ailments. He maintained a supply in his office and sold them directly to the patients for whom he prescribed. As pointed out above, the practice of medicine, by statute, "shall mean to suggest, recommend, prescribe or direct for the use of any person, any drug, medicine, appliance or other agency ... for the cure, relief, or palliation of any ailment or disease . . after having received ... compensation... . Miss. Code Ann. § 73-25-33 (1972). If then, "vitamins" are included within the meaning of "drug, medicine, appliance or other agency, such practice constitutes the unlicensed practice of medicine."
In Harris v. State, 229 Miss. 755, 92 So.2d 217 (1957), where suit was brought against a chiropractor for unlicensed practice of medicine, this Court said:
The question is further presented as to whether the appellant's treatment of John Minor by the injection of vitamins under all of the facts and circumstances of the case brought him within the statutory definition of practicing medicine. In other words, whether in so treating John Minor by injecting vitamins, the appellant was for compensation suggesting, recommending, prescribing, or directing for the use of the patient a drug, medicine, appliance, or other agency for the cure, relief or palliation of any ailment or disease of the body of the patient. In determining this question, we adopt that interpretation of the statute which is most favorable to the appellant and apply the rule of ejusdem generis to the words "or other agency," and construe the words to mean other agency akin to or of like character with a drug or medicine. 41 Am.Jur., Physicians and Surgeons, Sec. 27, p. 157.
Assuming as true the testimony of the appellant that he prescribed and administered vitamins in order to correct a vitamin deficiency, it necessarily follows that he prescribed and administered vitamins as an agency akin to medicine to correct a *1089 disorder or ailment in the human body which interfered with normal animal growth and was likely to produce disease. (229 Miss. at 766, 92 So.2d at 222).
Thus, the present prescription of vitamins to cure an ailment constitutes the unlicensed practice of medicine unless the Chiropractic Licensing Act of 1973 permits such a usage.
Norville testified in part that his usage of vitamin prescriptions was complementary to his administration of spinal adjustments and therefore justified under the licensing statute. However, having concluded in the Harris case that vitamins are a medicine[2], Norville is precluded from making such an argument by the very words of the Chiropractic Licensing statute itself. The statute clearly states that the correction of interference with normal nerve transmission which is the purpose of chiropractic, shall be done "... without the use of drugs or surgery." (Emphasis added). Section 73-6-1, Mississippi Code Annotated (1972). Section 1-3-7 defines the term "drugs" in the following manner:
The term "drugs" when used in any statute shall embrace all medicines for internal or external use for man or beast.
Thus, since vitamins are a medicine and the word "drugs" encompasses all medicines for use for man, the licensing act itself prohibits their use in the practice of chiropractic. We therefore conclude that the prescription of vitamins for the cure of an ailment by a chiropractor does constitute the illegal practice of medicine and such use is prohibited to chiropractors.
Norville has argued strenuously that since none of the vitamins involved require medical prescription and may be purchased by any layman over the counter in most stores, use of such vitamins should not be denominated "practice of medicine." We are fully cognizant that any layman can obtain such vitamins and that any retailer can sell such vitamins. Purchase of or sale of vitamins is not however the vice which is condemned here. Rather the vice condemned and that which constitutes the unlicensed practice of medicine is (1) prescription of vitamins, (2) to cure, (3) an ailment or disease, (4) for compensation.
The chiropractor on the present facts does not simply sell vitamins to a customer who asks for them as does a retailer. Rather, he represents to a patient who has come to him that such vitamins will cure a disease or ailment. Further, unlike the relative or friend who recommends that someone take vitamins for nutrition or to prevent colds, and neither expects nor receives any compensation for such "advice," the chiropractor in a professional capacity advises the patient to take the vitamins for the ailment or disease, charges compensation for such advice, and may cause the patient to think his ailment or disease will thereby be cured. This is the vice condemned and the danger of such is amply demonstrated by the record.
Norville testified that his treatment for people with high blood pressure or excessive cholesterol in the blood was a product called Cholaplex which was described as "a nutritional concentrate containing extracts of Calf Brain and Beef Liver, soluble fermentation residues, dehydrated extract of buckwheat (Green Leav) ageous extract of Bovine Orchic tissue [cow gonads]... yeast beef lipids and organic iodine protein complex." When asked how he diagnosed the presence of cholesterol in the blood, he replied "by physical examination," but admitted he did not take a blood specimen. There exists then the danger that a patient will be subjected to a medicine for a condition which does not exist, or fail to seek proper medical attention under the belief he is being "cured" by vitamins.
Thus, conceding that the vitamins prescribed may cause no harm themselves, may *1090 even be beneficial, and may be obtained without medical prescription, nevertheless, there are sufficient reasons to justify the legislative determination classifying the use of medicines, including vitamins, to cure ailments as the practice of medicine, and prohibiting chiropractors from utilizing medicines, including vitamins, to cure ailments.

III.
Was the petitioner, Mississippi State Medical Association, required to prove irreparable harm and lack of an adequate remedy at law before an injunction could issue?
Appellant argues that the Mississippi State Medical Association had no standing to bring this suit, and even if they had standing, they failed to show the prerequisites for injunctive relief, e.g., no adequate legal remedy and the existence of irreparable harm.
The first contention, going to existence of standing, has no merit. In an analogous case where a county bar association[3] brought suit against a chancery court clerk for the unauthorized practice of law, we held that the bar association was a proper party in a suit of that nature, stating, "They had an interest in the subject matter, responsibilities as officers of the court, and were affected by any unauthorized practice of law." Darby v. Miss. State Board of Bar Admissions, 185 So.2d 684, 686 (Miss. 1966). On the issue of standing, there exists no reason to distinguish Darby. The State Medical Association has the same interest in preventing unlicensed practice as the State Bar Association.
However, with regard to the requirement of showing the usual prerequisites for injunctive relief, appellant stands on firmer ground. In Redmond v. State, 152 Miss. 54, 118 So. 360 (1928), a suit to enjoin the unauthorized practice of medicine, under a nuisance theory, this Court held that there must be a showing of irreparable harm and that there exists no other adequate remedy at law. In reaching that conclusion, the Court pointed out that the unlicensed practice of medicine "is not a nuisance per se, and if a nuisance at all, would be made such by the manner in which it was pursued." (152 Miss. at 78, 118 So. at 367).
In requiring the establishment of prerequisites in such a case, the Court based its reasoning on the proposition that:
It is a delicate, though often a necessary, thing to condemn a business operated by a citizen. It may result in great loss, or even ruin, to his business. (152 Miss. at 82, 118 So. at 369.)
We note that while the evidence in this case clearly established the possibility of harm, there was no showing that actual harm had in fact resulted. Additionally, Mississippi State Medical Association has not shown that there are no other available legal remedies at law.
It is argued that section 73-51-1 should be construed to allow suit by the Mississippi State Medical Association without the need to show irreparable harm or lack of other adequate legal remedy. Section 73-51-1 reads as follows:
An action for an injunction may be brought and maintained in the name of any state board authorized to hold examinations and grant licenses to practice any profession to enjoin and prohibit any person from the practice of any profession required to be licensed by said board, when such person is practicing said profession and has not been granted a license therefor. (Emphasis added).
The argument of the Mississippi State Medical Association is that the statute was construed in an analogous case to obviate the need for showing irreparable harm, thus overruling the Redmond decision, Conway v. State Board of Health, 252 Miss. 315, 173 So.2d 412 (1965), and that in the Darby case, supra, we allowed a local bar association to bring suit without requiring a showing of irreparable harm or lack of legal remedy. This argument is not persuasive.
*1091 It is true that Conway construed suit under the statute to obviate the need for such a showing stating: "Section 8923-51 [now Mississippi Code Annotated section 73-51-1 (1972)] by implication assumes there was not an adequate remedy at law and that the injury was irreparable, i.e., the legislation was needed or else it would not have been enacted." (252 Miss. 324-25), 173 So.2d 416.
However, there, suit was brought by the State Board authorized to issue the license as required by section 73-51-1. Similarly, in Darby, while we allowed the local bar association to have standing, we note that the state licensing board, e.g., the State Board of Bar Examiners, was a party to the suit, thus invoking the waiver of the usual injunctive prerequisites under the statute and the Conway decision.
In the present case, the state licensing board, e.g., the State Health Board, is not a party to the suit. In the absence of the state licensing board as a party to the suit, the requirement of Redmond still exists. We are of the opinion that the legislature, being cognizant of the holding in Redmond, carefully limited its wording when enacting the statute. Thus, at present, the existing statutory remedies which obviate the need for showing irreparable harm and lack of adequate legal remedies [Miss. Code Ann. § 73-51-1 (1972) and § 73-6-29 (Supp. 1977)] must be brought in the name of the licensing agency or of some official state prosecutor. The likely purpose of this was to require an official state investigation before such serious charges are leveled at a defendant. This is not to say that a state professional association is precluded from bringing suit, but in such instances, the proof must satisfy the irreparable harm requirement and it must be shown that other legal remedies are not available or have failed of effectiveness. That was not done in this case and the injunction was erroneously issued. Therefore, the injunction is dissolved.
REVERSED AND INJUNCTION DISSOLVED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, BROOM, LEE, BOWLING and COFER, JJ., concur.
NOTES
[1] In 1966 the Legislature enacted the Physical Therapists Licensing Law (Laws, Ch. 484, Sections 73-23-1 through 73-23-25, Miss. Code Ann. 1972). The use of electrical appliances such as diathermy and ultrasonic machines by physiotherapists is not, however, "separate and apart from the field of medicine or surgery," since Section 73-23-19 requires the physiotherapist to practice under, and only under the prescription or direction of a regularly qualified doctor of medicine.
[2] "The fact that the substance employed as a remedial agent may have value as a food, and a tendency to build up and restore wasted or diseased tissue, will not deprive it of its character as a `medicine' if it is administered and employed for that purpose." 57 C.J.S. Medicine p. 1042, cited as controlling in Harris v. State, 229 Miss. 755, 767, 92 So.2d 217, 222 (1957).
[3] In conjunction with the State Board of Bar Admissions.