# SUPPLEMENT.

## OPINIONS OF THE JUSTICES TO THE HOUSE OF REPRESENTATIVES.

By FIELD, C. J., ALLEN, KNOWLTON, MORTON, & LATHROP, JJ. The Legislature
has not the power, under the Constitution, to authorize the cities and towns
within the Commonwealth to buy coal and wood for the purpose of sale to
their inhabitants for fuel.

By HOLMES, J. The Legislature has the power to give such authority.

By BARKER, J. The Legislature cannot authorize towns and cities to engage in
trade merely that it may be better carried on; but may authorize them to deal
in fuel, if the necessities of the people can be met only in that way.

THE following order was adopted by the House of Representa-
tives on April 12, 1892, and thereupon transmitted to the Jus-
tices of the Supreme Judicial Court, who, on May 7, 1892,
returned the opinions which are · subjoined.

Ordered, That the opinion of the Justices of the Supreme Ju-
dicial Court be required upon the following important questions:

First. Is it within the constitutional power of the Legislature
to enact a law conferring upon a city or town within this Com-
monwealth the power to purchase coal and wood as fuel, in ex-
cess of its ordinary requirements, for the purpose of selling such
excess, so purchased, to its own citizens?

Second. Is it within the constitutional power of the Legisla-
ture to enact a law conferring upon a city or town within this
Commonwealth the power to purchase, for the purpose of sale,
and to sell to its own citizens, coal and wood as fuel?

Third. Is it within the constitutional power of the Legislature
to enact a law conferring upon cities and towns within this
Commonwealth authority to establish and maintain municipal
fuel or coal yards for the purpose of selling coal, wood, or other
fuel to the inhabitants of such cities and towns?

And be it further ordered, That the Justices of the Supreme Judicial Court be informed that the foregoing questions are propounded with a view to further legislation upon the subjects therein referred to, and that for their more particular information a copy of House Document No. 395, being a bill now pending before this House, and upon the subject matter of which the foregoing questions are propounded, be transmitted to the Justices.

The House document referred to in the above order, and transmitted therewith to the Justices, contained the following bill, entitled " An Act to enable Cities and Towns to purchase, sell, and distribute Fuel. "

Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows :

Section 1. Any city or town may, under the limitations of this act, construct, purchase, lease or establish and maintain within its limits one or more fuel yards for the purpose of supplying the municipality with coal, wood, or other fuel, and selling and distributing the same to such of its inhabitants as may purchase the said fuel. Such fuel yards may include suitable lands, structures, easements, water privileges, horses, carts, scales, and other apparatus and appliances necessary for the storage, sale, and distribution of coal, wood, and other articles of fuel.

Sect. 2. No city shall exercise the authority conferred in section one until a vote that it is expedient to exercise such authority shall have passed each branch of its city council by a two-thirds vote and received the approval of the mayor, and thereafter have been ratified by a majority of the voters present and voting thereon at an annual municipal election. When such a vote has failed to secure such ratification, no similar vote shall be submitted for ratification until after the expiration of five years thereafter.

Sect. 3. No town shall exercise the authority conferred in section one until after a vote that it is expedient to exercise such authority shall have been passed by a vote of not less than two thirds of the voters present and voting at each of two legal town

meetings duly called for the purpose, of which meetings the second shall be held at an interval of not less than two nor more than thirteen months after the first. At such meetings such vote shall be taken by written or printed ballot, and by the use of the check list. When such a vote has failed of passage as hereinbefore provided at the second of said meetings, no similar vote shall be passed until after the expiration of two years thereafter.

Sect. 4. Any city or town establishing or purchasing a fuel yard within its limits, as provided in this act, or reconstructing, extending, or enlarging the same, as provided in section five, may pay for the same by the issue of bonds, payable in a term not exceeding thirty years, and bearing interest at a rate not exceeding five per cent, which shall not be disposed of for less than par and accrued interest, and the indebtedness thereby created shall not be included in the limit of indebtedness of such city or town provided by law; but such bonds shall not be issued until a vote authorizing the same has been passed by the vote required by section seven of chapter twenty-nine of the Public Statutes, and the whole amount of bonds so issued by a city or town, and outstanding, shall not exceed at their par value the amount of five per cent of the total valuation of estates therein in the case of a town, or two and one half per cent of such valuation in the case of a city, according to the last preceding State valuation. The interest on such bonds and a sinking fund to meet the same at maturity shall be provided for as required by section nine of said chapter twenty-nine. No indebtedness shall be incurred by any city or town in connection with such fuel yard except as aforesaid, and excepting further that money may be borrowed under the provisions of section six of said chapter twenty-nine as amended, to pay the operating expenses thereof. All receipts from the sale of fuel shall be paid over to the treasurer of such city or town. The gross expenses of running and conducting such business of purchasing, selling, storing, and distributing fuel, including interest on such bonds and requirements of the sinking fund as aforesaid, shall be included in the appropriations made annually or from time to time by such city or town, and shall be paid out of the treasury thereof.

Sect. 5. Any city or town owning a municipal fuel yard may

reconstruct, extend, or enlarge the same, but no such reconstruction, extension, or enlargement, beyond the necessary and ordinary maintenance, repair, and replacement thereof, except such increased apparatus and appliances for the sale and distribution of fuel as may be necessary to furnish the same to new takers, shall be undertaken or made, except by the vote provided by section four in the case of the issue of bonds.

Sect. 6. When any city or town owns a municipal fuel yard, the city council of said city and the selectmen of the said town may make such rules and regulations, not inconsistent with the provisions of this act, as may be deemed necessary for an honest, safe, and economic management of the business.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts.

We, five of the Justices of the Supreme Judicial Court, in reply to your order, respectfully submit the following opinion.

Whether the Legislature can authorize a city or town to buy coal and wood, and to sell them to its inhabitants for fuel, must be determined by considering whether the carrying on of such a business for the benefit of the inhabitants can be regarded as a public service. This inquiry underlies all the questions on which our opinion is required. If such a business is to be carried on, it must be with money raised by taxation. It is settled that the Legislature can authorize a city or town to tax its inhabitants only for public purposes. This is not only the law of this Commonwealth, but of the States generally and of the United States. The following are some of the decisions or opinions on the subject: *Lowell* v. *Boston*, 111 Mass. 454. *Mead* v. *Acton*, 139 Mass. 341. *Opinion of the Justices*, 150 Mass. 592. *Kingman* v. *Brockton*, 153 Mass. 255. *Loan Association* v. *Topeka*, 20 Wall. 655. *Ottawa* v. *Carey*, 108 U. S. 110. *Cole* v. *La Grange*, 113 U. S. 1. *Allen* v. *Jay*, 60 Maine, 124. *Opinion of the Justices*, 58 Maine, 590. *Attorney General* v. *Eau Claire*, 37 Wis. 400. *State* v. *Eau Claire*, 40 Wis. 533. *State* v. *Osawkee*, 14 Kans. 418. *Mather* v. *Ottawa*, 114 Ill. 659.

It is not easy to determine in every case whether a benefit conferred upon many individuals in a community can be called a public service within the meaning of the rule that taxes can

be laid only for public purposes. In general, however, it may be said that the promotion by taxation of the private interests of many individuals is not a public service within the meaning of the Constitution. The preamble of the Constitution declares that " The end of the institution, maintenance, and administration of government is to secure the existence of the body politic, to protect it, and to furnish the individuals who compose it with the power of enjoying in safety and tranquillity their natural rights and the blessings of life." It is declared in Part I., Art. I.: "All men are born free and equal, and have certain natural, essential, and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing, and protecting property; in fine, that of seeking and obtaining their safety and happiness."

Constitutional questions concerning the power of taxation necessarily are largely historical questions. The Constitution must be interpreted as any other instrument with reference to the circumstances under which it was framed and adopted. It is not necessary to show that the men who framed it or who adopted it had in mind everything which by construction may be found in it, but some regard must be had to the modes of thought and action on political subjects then prevailing, to the discussions upon the nature of the government to be established, to the meaning of the language used as then understood, and to the grounds on which the adoption or rejection of the Constitution was advocated before the people. We know of nothing in the history of the adoption of the Constitution that gives any countenance to the theory that the buying and selling of such articles as coal and wood for the use of the inhabitants was regarded at that time as one of the ordinary functions of the government which was to be established. There are nowhere in the Constitution any provisions which tend to show that the government was established for the purpose of carrying on the buying and selling of such merchandise as at the time when the Constitution was adopted was usually bought and sold by individuals, and with which individuals were able to supply the community, no matter how essential the business might be to the welfare of the inhabitants. The object of the Constitu-

tion was to protect individuals in their rights to carry on the customary business of life, rather than to authorize the Commonwealth or the " towns, parishes, precincts, and other bodies politic " to undertake what had usually been left to the private enterprise of individuals.

In the opinion in *Loan Association* v. *Topeka*, 20 Wall. 655, 664, the Supreme Court of the United States say: " It is undoubtedly the duty of the legislature which imposes or authorizes municipalities to impose a tax to see that it is not to be used for purposes of private interest instead of a public use, and the courts can only be justified in interposing when a violation of this principle is clear and the reason for interference cogent. And in deciding whether, in the given case, the object for which the taxes are assessed falls upon the one side or the other of this line, they must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether State or municipal."

The early usages of towns undoubtedly did not exhaust the authority which the Legislature can confer upon municipalities to levy taxes. Cities and towns, since the adoption of the Constitution, have been authorized to levy taxes for many other purposes than those for which taxes were then levied. Up to the present time, however, none of the purposes for which cities and towns have been authorized to raise money has included anything in the nature of what is commonly called trade or commercial business. Instances can be found of some very curious legislation by towns in the Colonial and Provincial times, some of which would certainly now be thought to be beyond the powers of towns under the Constitution. Whatever the theory was, towns in fact under the Colony Charter, and for some time under the Province Charter, often acted as if their powers were limited only by the opinion of the inhabitants as to what was best to be done. This was the result of their peculiar situation and condition, and the powers of towns or of the General Court were not much considered. The exercise of these extraordinary powers, however, gradually died out.

The purposes for which by the Province laws towns were authorized to raise money were for the maintenance of highways, the support of the ministry, schools, and the poor, and for the defraying of other necessary charges arising within the town. The words "necessary charges"* are still retained in the statutes, but they have been strictly construed by the courts. We do not find either in the Colony or the Province laws any legislation relating to the buying and selling of coal or wood by towns for the use of the inhabitants, or any legislation on any similar subject. It is possible that there may be found in the records of some town a vote or votes showing that the town in an emergency was authorized to buy wood or coal for the purpose of supplying its inhabitants with fuel, but we have not found any. Certainly it was not usual for towns to supply their inhabitants with fuel, unless they were paupers. Neither was it usual for towns to supply their inhabitants with grain or other commodities. We know of no instance of this being done, except by the town of Boston. In the fall of 1713 there was a scarcity of grain, and the General Court prohibited the exportation of it. 1 Prov. Laws, (State ed.) 724. The town of Boston in March, 1713–14, voted to lay in a stock of grain to the amount of five thousand bushels of corn, and to store it in some convenient place, and it was left to the selectmen to dispose of it as they saw fit. 8 Record Commissioners' Reports, 101, 104. After that, as shown by the records, the town regularly bought and stored grain and sold it to the inhabitants as late as 1775, and perhaps later, and it established two granaries, one of which, in the Common, remained in use probably as long as the town bought and sold grain. Whether after the Revolution the town continued to buy grain we are not informed, as the records have not been printed. The amount which could be sold to any one person was often limited to a few bushels at a time. The report of a committee in 1774 shows that from March, 1769, to March, 1774, the quantity of corn and rye purchased was 5,836 bushels, and that the stock on hand was 376 bushels. It is apparent that the original purpose was to provide against a famine, and that it was not the intention of the town to assume the business

---

* Pub. Sts. c. 27, § 10, *ad fin.*

of buying and selling all the grain which the inhabitants needed, but of keeping such an amount in store as was necessary in order that small quantities might be obtained, particularly by the poorer inhabitants, at what the selectmen, or a committee of the town, or the town itself, deemed reasonable prices. On May 25, 1795, the town voted to sell the granary. This action of the town of Boston was an exception to the usages of towns, and it appears from the reports of committees that before the Revolution it had come to be considered as of doubtful expediency, and during the Revolution, or not long after, it was discontinued.

The nearest analogy under the Constitution to the subject we are considering is the authority given by the recent statute (St. 1891, c. 370) whereby cities and towns are empowered to maintain works for the manufacture and distribution of gas or electricity for furnishing light to the municipalities and their inhabitants. In the opinion given to the House of Representatives on May 27, 1890, which is printed in 150 Mass. 592, the Justices advised that the manufacture and distribution of gas or electricity for furnishing light to the inhabitants of cities and towns might properly be regarded as constituting a public service. It was there said : " It must often be a question of kind and degree whether the promotion of the interests of many individuals in the same community constitutes a public service or not." Gas or electricity for furnishing light has in recent times become a most convenient means of lighting both public and private buildings, streets, and grounds. It is impracticable that each individual should manufacture gas or electricity for himself, but this can best be done by some company or the municipality for a considerable territory, and for the use of both the municipality itself and the inhabitants. Everybody who chooses within that territory cannot be permitted to manufacture and distribute gas or electricity for the public use or the use of other persons, as it is distributed by means of pipes or wires, and the number who properly can be permitted to lay pipes or wires in a given territory must be limited to one, or at most to a few persons or corporations. The pipes or wires must be laid in or over the public ways, or in or over land taken for the purpose, which may require the exercise of the right of

eminent domain. These were some of the reasons why the subject seemed to the Justices a proper one for municipal regulation and control, and to constitute a service which a municipality could be authorized to perform for itself and its inhabitants.

But when the Constitution was adopted the buying and selling of wood and coal for fuel was a well known form of private business, which was generally carried on as other kinds of business were carried on ; and is now carried on in much the same manner as it was then. It was and is a kind of business which in its relations to the community did not and does not differ essentially from the business of buying and selling any other of the necessaries of life. Although all kinds of business may be regulated by the Legislature, yet to buy and sell coal and wood for fuel requires no authority from the Legislature, and requires the exercise of no powers derived from the Legislature, and every person who chooses can engage in it in the same manner as in the buying and selling of other merchandise. We are not aware of any necessity why cities and towns should undertake this form of business any more than many others which have always been conducted by private enterprise, and we are not called upon to consider what extraordinary powers the Commonwealth may exercise, or may authorize cities and towns to exercise, in extraordinary exigencies for the safety of the State or the welfare of the inhabitants. If there be any advantage to the inhabitants in buying and selling coal and wood for fuel at the risk of the community on a large scale, and on what has been called the co-operative plan, we are of the opinion that the Constitution does not contemplate this as one of the ends for which the government was established, or as a public service for which cities and towns may be authorized to tax their inhabitants.

We therefore answer the questions in the negative.

WALBRIDGE A. FIELD.
CHARLES ALLEN.
MARCUS P. KNOWLTON.
JAMES M. MORTON.
JOHN LATHROP.

May 7, 1892.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts.

I am of opinion that when money is taken to enable a public body to offer to the public without discrimination an article of general necessity, the purpose is no less public when that article is wood or coal than when it is water, or gas, or electricity, or education, to say nothing of cases like the support of paupers or the taking of land for railroads or public markets.

I see no ground for denying the power of the Legislature to enact the laws mentioned in the questions proposed. The need or expediency of such legislation is not for us to consider.

OLIVER WENDELL HOLMES, JR.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts.

In reply to the questions submitted by your order of April 12, 1892, for the opinion of the Justices of the Supreme Judicial Court, I have to say that under our Constitution "The end of the institution, maintenance, and administration of government is to secure the existence of the body politic, to protect it, and to furnish the individuals who compose it with the power of enjoying in safety and tranquillity their natural rights and the blessings of life." Without artificial heat, very few of our inhabitants would have the power of enjoying these rights and blessings. So far, and so far only, as it is a necessity of society as now organized, for the government to supply fuel in order to afford an environment which shall give this power, it is competent for the government to furnish or to provide for a supply. But it is not within its constitutional power to engage in trade or manufacture merely for the purpose of having any branch of business conducted upon a convenient or economical plan. Fuel is now legitimately furnished to paupers by towns and cities at the public expense. If there is an emergency, local or general, which cannot be adequately met by ordinary private agency, it is within the constitutional power of the government to supply the needs of the people in this respect, either through the towns and cities, or through other agencies. The question of the exigency, in the first instance, is for the Legislature. If there is

no adequate source of supply of fuel except through the establishment of governmental agencies, they may be lawfully inaugurated. If, on the other hand, there is no want of adequate service, the Legislature has no constitutional right to create agencies for the purpose. It has no right to authorize towns and cities to engage in trade merely to try an experiment in practical economics, or to put in practice a theory.

My answer to the questions propounded is, therefore, " Yes, if the necessities of society, as now organized, can be met only by the adoption of such measures," and " No, if there is no such necessity, but merely an expediency for the trial of an experiment."

JAMES M. BARKER.