539 P.2d 1006

**STATE of New Mexico ex rel. Toney AN-
AYA, Attorney General, Petitioner,**

v.

**The Hon. Robert H. McBRIDE, District
Judge, Second Judicial District of New
Mexico, Respondent.**

**No. 10346.**

Supreme Court of New Mexico.

June 18, 1975.

Order of Ouster July 1, 1975.

Toney Anaya, Atty. Gen., Jay F. Rosenthal, Asst. Atty. Gen., Harry L. Bigbee, Sp. Asst. Atty. Gen., Santa Fe, for petitioner.

Bruce D. Hall, Willard F. Kitts, Albuquerque, Olmsted & Cohen, Charles D. Olmsted, Santa Fe, for respondent.

## OPINION

STEPHENSON, Justice.

This is a proceeding in quo warranto filed as an original action before us by the attorney general (petitioner) testing the constitutionality of the appointment of the Honorable Robert H. McBride (respondent) as district judge of the Second Judicial District. The controversy centers on Article IV, Section 28 of the Constitution of New Mexico which restricts the appointment of members of the legislature to civil offices under certain circumstances. Final resolution of the case has been delayed, pending the filing of a stipulation of counsel requested by us and which has now been received.

Respondent was elected to the New Mexico Senate at the general election held November 3, 1970 for a four-year term, and qualified in January, 1971. During the 1972 legislative session, the salaries of district judges were increased by $7,000.00 per annum. Respondent was again a successful candidate for election to the New Mexico Senate at the general election held November 5, 1974. However, before he qualified and prior to the commencement of the 1975 legislative session, Governor Apodaca appointed him to the district bench, filling a vacancy resulting from a resignation. Judge McBride qualified and has ever since been engaged in the discharge of those duties.

Petitioner contends that under the stated facts, respondent's appointment was in violation of N.M.Const. art. IV, § 28 which in part provides:

"No member of the legislature shall, during the term for which he was elected, be appointed to any civil office in the state, nor shall he within one year thereafter be appointed to any civil office created, or the emoluments of which were increased during such term; * * *."

A surplus of legal theories have been advanced in regard to this case by lawyers, both amateur and professional. However, the issues have markedly narrowed in scope during its pendency to an extent which reflects considerable credit upon the powers of analysis and breadth of vision of counsel for the parties. The petitioner's brief in chief contains seven points. The respondent's amended answer to the petition and his answer brief conceded the jurisdiction of the court, the propriety of a quo warranto proceeding under these circumstances, and the petitioner's standing to assert the constitutional prohibition to the respondent's appointment. Neither is it contended that the magnitude of the 1972 salary increase is de minimus.

Accordingly, counsel for respondent have answered to only two points raised by petitioner, one of which was an assertion that respondent had been appointed to a civil office during the term for which he had been elected in 1974. Counsel for the attorney general, in the reply brief, have even dropped this assertion, expressing doubt that mere election without subsequent qualification or acceptance of the office would bring the respondent within that portion of art. IV, § 28 which prohibits ap-

pointment during one's term. Moreover, inasmuch as respondent's successor as senator qualified on January 21, 1975 the petitioner now concedes that a holding that respondent should be ousted subject to immediate reappointment would serve no purpose.

Despite respondent's concession of jurisdiction and petitioner's standing to bring this action, the minority view in this case reasons that a procedural requirement in § 22–15–6, N.M.S.A.1953 was not satisfied because "the name of the person rightfully entitled to the office with a statement of his right thereto" was not set forth in the complaint. It is asserted that under State ex rel. Hannett v. Ct. 1st Dist., Santa Fe Co. et al., 30 N.M. 300, 233 P. 1002 (1925), this failure affects the subject matter jurisdiction of the court allowing us to raise the jurisdictional issue on our own accord and dismiss the action.

It is probably sufficient to say that this argument was not advanced by respondent, but in view of the nature of the case and the analysis of the dissent, we are not content to let the matter rest there.

As we understand the dissent, its primary thrust is to urge that quo warranto is "strictly statutory," that the pleading requirements specified in § 22–15–6, particularly the part requiring the name of the person rightfully entitled to the office, is "substantive," and, that allegation being omitted, we lack "jurisdiction."

We do not agree with any of this. Quo warranto is an ancient common law writ the origins of which are obscured by time. See 65 Am.Jur.2d "Quo Warranto" § 2 (1972). More to the point, N.M.Const. art. VI, § 3 states in part:

"The Supreme Court shall have original jurisdiction in quo warranto * * * against all state officers * * *."

■ Clearly, this court has power and authority to hear and determine quo warranto cases and to grant relief. There is thus no question at all concerning our jurisdiction. See Grace v. Oil Conservation Commission of New Mexico, 87 N.M. 205, 531 P.2d 939 (1975). Furthermore, the statutory provision requiring the name of the person rightfully entitled to the office is clearly procedural. Our constitutional power under N.M.Const. art. III, § 1 and art. VI, § 3 of superintending control over all inferior courts carries with it the inherent power to regulate all pleading, practice and procedure affecting the judicial branch of government. State v. Roy, 40 N.M. 397, 60 P.2d 646 (1936). See also Alexander v. Delgado, 84 N.M. 717, 507 P.2d 778 (1973); Sitta v. Zinn, 77 N.M. 146, 420 P.2d 131 (1966); State v. Arnold, 51 N.M. 311, 183 P.2d 845 (1947); City of Roswell v. Holmes, 44 N.M. 1, 96 P.2d 701 (1939); cf. State v. Gunzelman, 85 N.M. 295, 512 P.2d 55 (1973).

■ Under the Constitution, the legislature lacks the power to prescribe by statute rules of practice and procedure, although it has in the past attempted to do so. Certainly statutes purporting to regulate practice and procedure in the courts cannot be made binding, for the constitutional power is vested exclusively in this court.

In Alexander v. Delgado, supra, we referred to the statutes purporting to regulate certiorari to the Court of Appeals. We there said that:

"* * * [t]his court has no quarrel with the statutory arrangements which seem reasonable and workable and has not seen fit to change * * * by rule." 84 N.M. at 718, 507 P.2d at 779.

But we cannot give our approval to the portion of § 22–15–6 under discussion, at least not if it has the meaning attributed to it by the dissent, especially since the statute is inconsistent with Rule 12(a) of the Rules Governing Appeals [§ 21–12–12(a), N.M.S.A.1953 (1974 Interim Supp.)]. How would it be possible to make such an allegation here, or in any situation where a vacancy has been filled by appointment? Under the reasoning of the dissent, art. IV, § 28 would be read out of the Constitution and thus, a governor could make con-

stitutionally invalid appointments at his pleasure. Moreover, we would in such cases be shorn of our constitutional powers vis-a-vis quo warranto, and presumably, with additional bits of legislative ingenuity, of our powers to issue other extraordinary writs as well. Such could not have been the intention of the people when art. III, § 1 and art. VI, § 3 were adopted and we will not construe the Constitution to reach such an absurd result.

The part of the dissent under consideration relies primarily upon State ex rel. Hannett v. Ct. 1st Dist., Santa Fe Co. et al., supra, reasoning that quo warranto statutes must be "strictly applied." This is negated by Hannett's own words. Writing for the court, Chief Justice Parker said:

> "It may be said, preliminarily, that statutes of this kind are remedial in character, and as such should be liberally interpreted to effectuate the objects intended." 30 N.M. at 305, 233 P. at 1004.

Hannett is not authority for the proposition that the procedural requirement under discussion adversely affects the subject matter jurisdiction of this court to determine a quo warranto action questioning the constitutional legality of one's appointment to public office. Hannett was a prohibition proceeding brought to challenge Manuel B. Otero's right to bring a quo warranto action in his own name challenging the propriety of an election contest between him and Arthur T. (A. T.) Hannett. This court properly held, after reviewing the quo warranto statutes, that the state, through the attorney general, is an indispensable party plaintiff in a quo warranto proceeding "of this kind." The reason for this requirement, of course, is that:

> "* * * a private person cannot have the writ to adjudicate his title to an office, and, indeed, the proceeding in the nature of a quo warranto goes only to removing the intruder, and no further." Vigil v. Stroup, 15 N.M. 544, 552, 110 P. 830, 832 (1910).

Quo warranto is to:

> "* * * ascertain whether [the public officer] is constitutionally and legally authorized to perform any act in or exercise any functions of the office to which he lays claim." Holloman v. Lieb, 17 N.M. 270, 273, 125 P. 601, 602 (1912).

Nowhere in Hannett does the court even intimate that the procedural statute under discussion is jurisdictional.

█ Since the Constitution provides for separate and equal branches of government in New Mexico, any legislative measure which affects pleading, practice or procedure in relation to a power expressly vested by the Constitution in the judiciary, such as quo warranto, cannot be deemed binding. We cannot render inoperative a clause in the Constitution on so slender a reed. One of the primary purposes of quo warranto is to ascertain whether one is constitutionally authorized to hold the office he claims, whether by election or appointment, and we must liberally interpret the quo warranto statutes to effectuate that purpose. See Holloman v. Lieb, supra; State ex rel. Hannett v. Ct. 1st Dist., Santa Fe Co. et al., supra. The petitioner is properly before the court.

Thus, as matters stand, the sole legal issue which we have before us is whether art. IV, § 28, particularly that portion which prohibits appointment of a legislator to civil office within one year following his elected term if the emoluments of that office were increased during such term, was violated. This issue in turn is broken down into two parts.

Respondent's first theory, ingeniously contrived, superbly briefed and forcefully argued, contends that at the time district judges' salaries were raised in 1972, he was not actually a senator. This argument is premised upon a complex and subtle interplay of various legislative acts and court decrees, both federal and state, which reapportioned the New Mexico Senate. It is claimed that the four-year term as senator which respondent commenced to serve in January of 1971, actually terminated prior to the 1972 session, and that because the

area represented by him had been expanded subsequent to the general election in 1970, he was required to run again to serve from 1972 onward, but did not do so.

However, facts discovered subsequent to the briefing and argument in this case clearly demonstrate that the respondent's senatorial district was not expanded subsequent to the 1970 general election. These facts are established by the stipulation of counsel to which we referred to at the outset. Thus, the factual premise upon which respondent's first argument is constructed is faulty and we need consider it no further.

However, it is necessary to again digress to the dissent which seems to find some legal significance in the claimed fact that the boundaries of respondent's senatorial district were expanded after the primary but before the general election in 1970 and, thereafter, contracted by the time of the 1972 general election, concluding on some unstated, and to us unknown, basis that "[a]t the very least, the respondent should have been a candidate for his Senate seat in 1972," and that his "service can obviously be called *de facto* in 1973 and 1974, negating any application" of art. IV, § 28.

There are so many things wrong with this it is difficult to know where to start, or to stop either. Again, this issue was not raised by the parties. The claimed facts about the expansion and contraction of respondent's senate district do not appear in the record. There was no testimony. For present purposes, however, we will accept these facts at face value.

Respondent has never attached any legal significance to any boundary changes other than an expansion of his district after the general election in 1970. As mentioned, this assertion was erroneous. Even the dissent does not claim this occurred. The only legal compulsion for respondent to have run in 1972 would have flowed from the legislation and court decrees we have mentioned. But they had the opposite effect since the glaring fact is that in the 1972 election, respondent's senatorial district lay entirely within the geographical boundaries of the district from which he was elected in 1970. This fact placed respondent's senatorial district squarely within § 10(A)(2) of the 1972 Senate Reapportionment Act (Laws 1972, ch. 79, § 10(A)(2)) quoted in the dissent. That act was upheld constitutionally by the Santa Fe County District Court in Cargo v. King, et al., No. 43123 (filed May 10, 1971; see Amended Order filed in open court, nunc pro tunc, as of March 10, 1972) and respondent was not, under the terms thereof, required to run again in 1972. Whether the district court made a correct decision we do not determine since no appeal was taken and no one, until now, has questioned it. The series of non sequiturs in the dissent urging that respondent should have been a candidate in 1972, therefore, he was a de facto senator for two years, therefore, art. IV, § 28 does not apply, is void of persuasiveness. No reason is suggested as to why art. IV, § 28 does not apply to a legislator who becomes de facto during the term for which he was elected and during which emoluments were increased.

■■ Even if we were to concede that respondent was a de facto senator in 1973 and 1974, which we do not, that status would render him no aid. The immutable facts are that in the fall of 1970 he was elected for a four-year term to the New Mexico Senate, that he qualified and was seated as a senator and acted as a senator throughout the entire four years, serving on various committees and on the floor of the Senate as an active and influential member. At no time has he questioned the constitutionality of the 1972 Senate Reapportionment Act or the court decree which held he did not have to run again in 1972. Having enjoyed the benefit of the law which allowed him to retain his position without contest in 1972, the respondent, even if he had raised it, would not be heard to question its propriety. See Clark v. Smith, 193 Tenn. 194, 245 S.W.2d 197 (1951). A de facto officer is estopped

from taking advantage of his own want of title. State v. Mayeux, 228 La. 6, 11, 81 So.2d 426, 427 (1955).

■ The final legal proposition advanced by respondent argues that art. IV, § 28 is not applicable to appointments of legislators to fill judicial vacancies. He points out that art. IV, § 28 was adopted as an original provision of our state Constitution on January 21, 1911.[1]

Our original Constitution created the elective executive offices of governor, lieutenant governor, secretary of state, state auditor, state treasurer, attorney general, superintendent of public instruction, commissioner of public lands,[2] and three corporation commissioners,[3] and specified the amounts of compensation each could receive in full payment for all services.[4]

The original Constitution also established the elective offices of supreme court justices[5] and district court judges for specified terms,[6] provided for appointments by the Governor to fill vacancies only until the next general election,[7] and specified the amounts of salary each was to receive[8] ($6,000.00 and $4,500.00 per annum respectively). Only after publication of the 1920 United States Census could the legislature increase the number of supreme court justices[9] and judicial districts.[10] The salaries of all supreme court justices and district court judges, however, remained fixed by the Constitution until art. VI was amended in 1953 to provide:[11]

"Sec. 11. The justices of the Supreme Court shall each receive such salary as may hereafter be fixed by law.

"* * *.

"Sec. 17. The legislature shall provide by law for the compensation of the judges of the district court."

Thus, the original Constitution itself created all elective executive and judicial offices and fixed the salaries. The legislature had the power to increase or decrease the compensation of executive officers from and after "ten years from the date of the admission of New Mexico as a state."[12] As for judicial officers, the original Constitution conferred no power on the legislature to increase or decrease the salaries of such offices until 1953 when our Constitution was amended, in the manner we have stated, to otherwise provide.

From these constitutional and historical premises, respondent reasons that art. IV, § 28 of the Constitution could not at the time of its adoption have been intended by the people to apply to judicial appointments because the legislature lacked the power to increase judicial salaries.

The primary difficulty with respondent's argument is that it disregards a most fundamental idea in constitutional law. It is through the constitution that the people speak. In applying its provisions, we seek to learn and give effect to their intentions. If a constitutional provision is clear and unambiguous our duty is clear and our task an easy one. We simply apply the constitutional provision. Rather than searching for hidden meanings and nuances, we assume that the people meant and intended what they said. It is not for us to question their wisdom or to judicially convolute clearly expressed intentions.

1. The antecedents of art. IV, § 28 of the Constitution of New Mexico are provided in art. 1, § 6, 2d para. of the Constitution of the United States, and § 9 of the Organic Act establishing the Territory of New Mexico (9 Stats. 446, ch. 49, enacted September 9, 1850).

2. N.M.Const., art. V, § 1 (1911).

3. Id., art. XI, § 2.

4. Id., art. V, § 12 and art. XI, § 5.

5. Id., art. VI, § 4.

6. Id., art. VI, § 12.

7. Id., art. XX, § 4.

8. Id., art. VI, §§ 11 and 17.

9. Id., art. VI, § 10.

10. Id., art. VI, § 16.

11. Proposed by H.J.R. Nos. 15 and 16, Laws 1953, pp. 632–633; adopted at a special election on September 15, 1953.

12. Id., art. V, § 12.

It is not suggested that art. IV, § 28 is ambiguous.

In stark contrast to the dissent's analysis of the musty procedural statute by which we would be bound hand and foot and shorn of our jurisdiction, is the dissent's reasoning as to art. IV, § 28, which it would decline to apply.

It is said that the parallel clause in the federal Constitution had substantial opposition during the constitutional convention; that it is archaic and overbroad; and that it runs counter to the public policy of eligibility for public office. It is also argued that its purpose was to prevent corruption and, since no possibility of that is present here, art. IV, § 28 should not be given effect.

Again, we cannot so lightly brush aside the expressed will of the people. Much of what the dissent has to say would be persuasive were the issue whether, as citizens, we would vote for its repeal in an election called for that purpose. But our obligation as judges is different. Though the history and purpose of the clause be conceded, as well as possibly our own personal views that art. IV, § 28 probably does not comport with present day circumstances, in constitutional adjudication, judges are not free to indulge in their private proclivities. To quote and paraphrase the great proponent of judicial self-restraint, Oliver Wendell Holmes, Jr., "[t]he need or expediency of such [a clause] is not for us to consider." Advisory Opinion of the Justices, 155 Mass. 598, 607, 30 N.E. 1142, 1146 (1892). We are bound to apply the Constitution as it plainly reads to leave to the people the decision as to whether it should be changed.

■ Another infirmity in respondent's argument is that art. IV, § 28 is not couched in terms of salaries but rather speaks of "emoluments." What are "emoluments?" 63 Am.Jur.2d, Public Officers and Employees, § 71 (1972), states in part:

"The term 'emoluments,' as elsewhere defined, covers profits from an office.

It does not refer to the fixed salary alone that is attached to the office, but includes such fees and compensation as the incumbent of the office is by law entitled to receive. In determining whether there has been an increase in the emoluments of a particular office, the various items of salary and other compensation which the incumbent was entitled to receive under the statute previously in effect must be taken together."

Clearly, "emolument" is a broader term than "salary." Counsel for the attorney general points out that even prior to the 1953 constitutional amendments, the legislature could have and in fact did, increase the emoluments of the office of district judge. The legislature accomplished this by establishing juvenile courts and providing for an additional salary to be paid to its judges. Only district judges could hold that position. This device was first created by Laws 1921, Ch. 87, § 2 and was utilized until the constitutional amendment in 1953. These additional emoluments were never questioned.

Thus respondent's argument that at the time of adoption of the Constitution, the people could not have intended art. IV, § 28 to apply to appointments to the district court bench rings rather hollow. Being aware of the reservations with which the public regards those in public life, it seems more likely that what the people really intended was what Joseph Story stated in commenting upon the parallel clause in the federal Constitution. In this work on the Constitution, he wrote:

"* * *. The reasons for excluding persons from offices who have been concerned in creating them, or increasing their emoluments, are to take away, as far as possible, any improper bias in the vote of the representative, and to secure the constituents some solemn pledge of his disinterestedness. * * *" 1 J. Story, Commentaries on the Constitution of the United States § 867 (5th ed. 1905).

No reason appears why art. IV, § 28 should not apply to judicial offices as it does to other civil offices.

Respondent places his principal reliance upon a South Dakota case which involved similar facts, State v. Ostroot, 75 S.D. 319, 64 N.W.2d 62 (1954). Art. III, § 12 of the Constitution of South Dakota provided in part:

"No member of the Legislature shall, during the term for which he was elected, be appointed or elected to any civil office in the state which shall have been created, or the emoluments of which shall have been increased during the term for which he was elected, * * *."

At the general election held on November 4, 1952, Joe J. Foss was elected to the office of state representative for a two year term. He thereafter qualified for the office in January 1953 and served. During the 1953 session of the South Dakota legislature, the salary of the governor was increased. In 1954, Mr. Foss circulated and filed with the Secretary of State his petitions to nominate him as a candidate for governor at the primary election to be held on June 1, 1954. The action ensued when the plaintiff sought a writ of prohibition to prohibit the Secretary of State from certifying the name of Mr. Foss as a candidate for governor in the primary election.

In South Dakota, the governor's salary, as well as those of other constitutional officers, including members of the legislature, was fixed by the Constitution until 1946, when an amendment was passed which enabled the legislature to fix them.

The South Dakota court reasoned that, inasmuch as the governor's salary was initially fixed by art. 21, § 2 the people could not have intended art. 3, § 12 to apply to that office, exactly as respondent would have us do here and in similar disregard of the rule of self-restraint to which we have referred. Special emphasis was placed on the fact that the 1946 amendment to art. 21, § 2 which enabled the legislature to fix such salaries, required a two-thirds vote of both houses in order for them to do so, a feature which is not present in the case at bar. The South Dakota court reasoned that as a result of the 1946 amendment "the whole concept of fixing salaries of constitutional officers * * * was altered." The word "altered" is a singularly apt one to describe what the South Dakota court then did to art. 3, § 12. The holding was that it was to be given no further application to constitutional offices. This amounts to a repeal by implication, although the court did not so label it. This appears to have been in clear violation of another basic rule of construction—that repeals by implication are not favored and only take place when the portions of the constitution or statute under consideration are in irreconcilable conflict. This principle did not receive the attention of the South Dakota court.

The two portions of the South Dakota Constitution under consideration were not in conflict and did not even deal with the same subject matter. Art. 3, § 12 dealt with restrictions on the candidacy or appointment of legislators to civil office. Art. 21, § 2 dealt with the fixing of salaries of constitutional offices.

The cornerstone of the South Dakota court's reasoning was that since the salaries of constitutional officers were fixed by the Constitution "the legislature had no power to increase the salaries of these * * * officers." Yet art. 3, § 12 spoke in terms of "emoluments," a feature we have discussed. Moreover, it does not appear from the opinion whether the emoluments were, or could have been, increased by the legislature prior to the 1946 amendment as was the case in New Mexico prior to the 1953 amendment.

Ostroot concluded by observing, and apparently accorded particular weight to, the proposition that if art. 3, § 12 were applied, legislators who raised their own salaries could not run for reelection. This apparently was unthinkable. There are also features lacking in the case before us since N.M.Const. art. IV, § 28 applies only to

appointments and not to elections. In fact, the opinion in State v. Ostroot specifically limited its application to elections and not to appointments.

We are not persuaded in respondent's favor by State v. Ostroot. Cf. Dickinson v. Holm, 243 Minn. 34, 65 N.W.2d 654 (1954), and State v. Erickson, 180 Minn. 246, 230 N.W. 637 (1930) (in which the Supreme Court of Minnesota held under a similar constitutional provision and facts that a candidate was disqualified for a period of one year following the expiration of his legislative term of office).

■ Finally, we note the dissent's reasoning that the 1972 act did not increase the emoluments but merely effected a cost of living adjustment for the period following the last preceding increase in 1967.

The respondent conceded that the increase was not de minimus (which it obviously was not) and does not raise this issue. Moreover, the source of the figures is not known to us but, for present purposes, we accept them.

We doubt that when the people adopted art. IV, § 28 in 1911 they were thinking in terms of cost of living adjustments or that they intended to except such increases from the operation of that clause. Certainly, they did not say so. Nor do we understand the significance of the 1967 date. Clearly the emoluments were more after the increase than they were before—$7,000.00 more.

We hold that art. IV, § 28 of the Constitution of New Mexico applies to appointments to the judiciary. We are of the opinion that the appointment of respondent to the office of district judge of the Second Judicial District, under the facts of this case, was in violation of art. IV, § 28 and that it was accordingly invalid.

We have reached this conclusion with regret. We believe that Judge McBride would have discharged the duties of the office in commendable fashion and would have rendered a high order of service to the people of New Mexico.

The relief sought by the attorney general's petition in quo warranto will be granted. A judgment of ouster will be entered.

It is so ordered.

OMAN and MONTOYA, JJ., concur.

McMANUS, C. J., dissenting.

McMANUS, Chief Justice (dissenting).

After viewing the majority opinion it looked as though it was a dissent from a dissent. Rather than create another dissent I will maintain my original position on this case, as follows:

Judge McBride was appointed by the Honorable Jerry Apodaca, Governor of the State of New Mexico, to the said office of District Judge, to fill the vacancy created by the retirement of the Honorable Paul Larrazolo, District Judge of the Second Judicial District, Division VI. The Attorney General asserts that Judge McBride now usurps that office. The Attorney General further alleges that Judge McBride's appointment on January 3, 1975, was made in violation of N.M.Const., art. IV, Sec. 28, which reads:

"No member of the legislature shall, during the term for which he was elected, be appointed to any civil office in the state, nor shall he within one year thereafter be appointed to any civil office created, or the emoluments of which were increased during such term; nor shall any member of the legislature during the term for which he was elected nor within one year thereafter, be interested directly or indirectly in any contract with the state or any municipality thereof, which was authorized by any law passed during such term."

This constitutional provision is involved because respondent was elected to the State Senate from Senatorial District 37, in 1970. During respondent's tenure as a

state senator, the emoluments of district judges were changed by the legislature. Laws of New Mexico, ch. 67 (1972).

In 1972, however, there was a reapportionment and the length of then Senator McBride's term, plus his constituency, is subject to different interpretations, and will be discussed later herein, as the term of office and not the office itself is crucial to a determination of the issue at hand. In any event, respondent remained a member of the New Mexico State Senate until December 31, 1974, whether *de facto* or *de gracia*.

I agree that quo warranto is the proper proceeding in a cause such as that before us, i. e., to challenge the right of a person to hold the office of district judge. Whether or not the proceedings have been correctly followed will be a portion of the discussion herein.

In New Mexico, quo warranto actions became statutory proceedings (Laws 1919, ch. 28, § 1) and remain the same today (§§ 22–15–1 to 22–15–16, N.M.S.A.1953). As stated above, the attorney general is the proper party to initiate an action such as this under the provisions of § 22–15–4, supra, which sets out the following:

"An action may be brought by the attorney general or district attorney in the name of the state, upon his information or upon the complaint of any private person, against the parties offending in the following cases:.

"(a) When any person shall usurp, intrude into or unlawfully hold or exercise any public office, civil or military, or any franchise within this state, or any office or offices in a corporation created by authority of this state; * * *."

To properly initiate proceedings in quo warranto, we must look to other provisions in the statutes, specifically § 22–15–1, N. M.S.A.1953. This section describes procedurally how an action in the nature of quo warranto is begun, as follows:

"The remedies heretofore obtainable by writ of quo warranto and by proceedings by information in the nature of quo warranto shall be commenced by the filing of a complaint as in other civil actions, and it shall not be necessary to sue out such writs in form, but this section shall not prevent nor be construed to prohibit the use by the Supreme Court and the district courts of the state of writs and proceedings in the forms hitherto used in such cases by such courts."

Being satisfied that the requirements of § 22–15–1, supra, have been met, we must now look to the substantive requirements of the complaint as set out in § 22–15–6, supra, which provides:

"Whenever such action shall be brought against a person for usurping an office, the attorney general, district attorney or person complaining, in addition to the statement of the cause of action, shall also set forth in the complaint the name of the person rightfully entitled to the office with a statement of his right thereto, and in such cases, upon proof by affidavit that the defendant has received or is about to receive the fees and emoluments of the office by virtue of his usurpation thereof, the judge of the district court wherein such proceeding is pending, or a justice of the Supreme Court, if the proceeding be therein pending, may by order require the defendant to furnish a good and sufficient bond, within a designated time not exceeding fifteen [15] days, executed and acknowledged as required by law in the case of supersedeas bonds on appeal, to be approved by said judge, conditioned that in case the person alleged to be entitled to the office should prevail, the defendant will repay to him all fees and emoluments of the office received by him and by means of his usurpation thereof, and in addition to said bond, or in case of a

failure to give said bond, the said judge or justice shall upon good cause shown, issue a writ of injunction directed to the proper disbursing officer enjoining and restraining him from issuing to the defendant or his assigns any warrant, check, certificate or certificates of indebtedness representing fees or emoluments of said office, until the final adjudication of said cause."

It is necessary that the statutory requirements be carefully examined in this case as the remedy sought is *strictly statutory.* This is true in most states, and came about because the original or common-law writ of quo warranto, which evolved from England, involved a lengthy and complicated process and was also criminal in nature, causing it to fall into disuse. See W.L.Q. 1972 at 751.

In examining § 22–15–6, supra, we note that petitioner has failed to allege certain required facts as set out in the statute:

"Whenever such action shall be brought against a person for usurping an office, the attorney general, district attorney or person complaining, in addition to the statement of the cause of action, *shall also set forth in the complaint the name of the person rightfully entitled to the office with a statement of his right thereto, * * *." (Emphasis supplied.)*

Failure to include said allegations is *fatal.*

We dealt with the question of the requirements of the quo warranto statute in State ex rel. Hannett v. District Court of First Judicial Dist., 30 N.M. 300, 233 P. 1002 (1925), and considered the statutory requirements to be jurisdictional, stating at page 306, 233 P. at page 1004:

" * * * 'whenever such action shall be brought against a person for usurping an office, the Attorney General, district attorney or person complaining, in addition to the statement of the cause of action,'—*here follows provisions requiring*

*certain facts to be alleged,* and providing for a bond by the defendant for repayment of fees and emoluments in case he loses the office, and providing for an injunction against the disbursing officers from paying the defendant in case of his failure to give such bond. * * *" (Emphasis added.)

It is apparent from the foregoing review of the statute that the state is an indispensable party plaintiff in a proceeding of this kind. It is so provided by the letter of the statute. While the state, ordinarily, has no substantial interest in such a controversy, the real party in interest being the contestant for the office, who might well be allowed to bring the action in his own name, it is not for us to question the wisdom of the statute. That rests with the legislature.

The determination of when an action in quo warranto should lie is a legislative function, and the doctrine of separation of powers precludes us from engaging in their field.

Other states have dealt with this problem in different ways. Some have written their statutes in very general terms so as to avoid the type of problem before us. See Arkansas, Connecticut, Delaware, Florida, and Georgia. Meanwhile, other states have simply substituted the word "may" for "shall" in the portion of the statute that is of concern to us here. See Alabama, Alaska, and California.

One state which has dealt with the problem of interpretation of quo warranto statutes is Alabama, a state which has permissive rather than mandatory language in its statute. An early case construing the Alabama Statute is Louisville & N. R. Co. v. State, 154 Ala. 156, 45 So. 296 (1907), which held at 299:

" * * * a quo warranto proceeding, it seems to be strongly intimated if not directly held, that the rule in respect to clearness or precision of statement in

pleading should, on account of the requirements of the statute (section 3428), be more strictly applied to information than to pleadings in ordinary cases. * * *"

A more recent Alabama case following this reasoning is found in State v. Key, 276 Ala. 524, 525, 165 So.2d 76, 77 (1964):

"In this state quo warranto is a statutory proceeding and to be maintained it must meet the requirements of the statute as to parties and procedure. * * *"

The two foregoing Alabama cases seem to echo precisely the holding in the Hannett case, supra, which is the only New Mexico case on this point. The extreme nature of the remedy in a quo warranto action requires strict adherence to the statutory requirements.

In determining whether or not a court has jurisdiction of proceedings in quo warranto, reference must be made to the organic law and statutes of the state. Redmond v. State, 152 Miss. 54, 118 So. 360 (1928); Lindsey v. Attorney General, 33 Miss. 508 (1857). The foregoing being true, the attorney general cannot, by consent, confer jurisdiction on a court which it does not possess under the constitution or by statute. State R. R. Commission v. People, 44 Colo. 345, 98 P. 7 (1908). See also, State ex rel. Halfield v. Ireland et al., 130 Ind. 77, 29 N.E. 396 (1891).

State ex rel. Hague v. Slack, 200 Ind. 241, 162 N.E. 670 (1928), involved an action brought by the appellant against appellee in the nature of quo warranto for usurpation of the office of Mayor of Indianapolis. This proceeding was based on an Indiana statute which provided that whenever an information shall be filed by the prosecuting attorney against a person for usurping an office, it shall also set forth therein the name of the person rightfully entitled to the office, with an averment of his right thereto. The case was affirmed.

In Wood v. Arnall, 189 Ga. 362, 365, 6 S.E.2d 722, 724 (1939), the Georgia court said in connection with a quo warranto challenge to the holder of the office of attorney general:

"A quo warranto inquires into the right of any person to any public office the duties of which he is in fact discharging, but must be granted at the suit of some person either claiming the office or interested therein. * * *"

Turning from the procedural issues of the case to the substantive, it might be helpful first to examine the evolution of the constitutional section in question. U. S.Const., art. I, § 6 provides, in part:

"No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been increased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."

This particular section, quite similar to our own, was adopted at the Constitutional Convention of 1787, and met with considerable opposition. See, Objections to Appointments of Judges, 6 G.W.L.Q. 46, 81–82 (1937). It appears that proponents of the measure were extremely concerned with the possibility of corruption, no matter how remote. The section of the Constitution in question was introduced to include the additional one-year prohibition like New Mexico, but that portion was defeated. See, G.W.L.Q., supra, at 82 fn. 135, which quotes from 1 Farrard, The Records of the Federal Convention of 1787 (1911). It is obvious again that this one-year provision is archaic and over-broad.

Those in opposition to this provision of the Constitution felt that it discouraged merit and would open the door to bad ap-

pointments by the executive. They also believed that the most able men were to be found in the legislature, and the country should not be deprived of their services. See 6 G.W.L.Q., supra at 82, fn. 135. It is also interesting to note that the vote on this provision was very close, passing by a vote of 5 in the affirmative, 4 in the negative, and one state divided. See, 2 Farrand, supra, at 492, cited in 6 G.W.L.Q., supra, at 82 fn. 136.

Today, nearly two hundred years after the adoption of the provision in question, we still have problems with it. The section must be looked at, keeping in mind its purpose and, further, the fundamental rights of citizens in our democratic system. These thoughts were considered by the Utah Supreme Court in Shields v. Toronto, 16 Utah 2d 61, 395 P.2d 829, 830 (1964):

> "If this single provision stated all of the law and covered all of the rights of all of the persons affected, the answer to the problem we confront would be simple enough. But such is not the case. It is obviously not possible to state all of the law necessary to assure a well-ordered society in any such single prohibitory provision. For this reason it cannot properly be regarded as something isolated and absolute but must be considered in the light of its background and the purpose it was designated to serve; and in relation to other fundamental rights of citizens set forth in the entire Constitution which are essential to the proper functioning of our democratic form of government. One of the principal merits of our system of law and justice is that it does not function by casting reason aside and clinging slavishly to a literal application of one single provision of law to the exclusion of all others. Its policy is rather to follow the path of reason in order to avoid arbitrary and unjust results and to give recognition in the highest possible degree to all of the

rights assured by all of the Constitutional provisions."

It seems clear that the purpose of the provision in the New Mexico Constitution, art. 4, § 28, is the same as that espoused in regard to the federal version, namely, to eliminate corruption or possibility thereof. An examination of the facts in the case before us leads us to the conclusion that the provision in question must be stretched beyond the intention of even its most vigorous supporters. For example, when respondent was a member of the 1972 Senate which passed the salary increase in question, he could *not* have known whether there would even be a judicial vacancy; nor would he have known that the Honorable Jerry Apodaca would be elected Governor of New Mexico, and, lastly, whether any Governor would appoint the respondent to the vacant judgeship. To contend that there was personal gain involved in respondent's being a member of the Senate when the judicial salary increase was passed is absurd. In Shields v. Toronto, supra, the court stated, with reference to the intent of the provision, at 395 P.2d 830:

> "This purpose is altogether salutary. Let it be said with the greatest of emphasis that the provision referred to should neither be ignored nor evaded, but whenever there is even a remote possibility that the evil it was designed to prevent might exist, it should be applied in such manner as to accomplish its objective. However, when adequate safeguards in that respect are observed, there appears to be no good reason to carry this provision beyond that purpose and make an unreasoning application of it where no such evil, nor any possibility of it exists. This would work injustice by depriving citizens of their basic rights and would also tend to disrupt the orderly processes of democratic government."

We should be mindful that executive appointments should carry the same presumptions of constitutionality as legislative acts.

In a case similar to the present one the Washington Supreme Court stated in State ex rel. O'Connell v. Dubuque, 68 Wash.2d 553, 413 P.2d 972, 980 (1966):

"A strong public policy exists in favor of eligibility for public office, and the constitution, where the language and context allows, should be construed so as to preserve this eligibility. * * *"

In concluding this discussion, I find the language of the court in Shields v. Toronto, supra, very persuasive, stating at pages 832–833:

"So important that it cannot be ignored, but must be considered in the composite picture, is the effect the plaintiffs contended for application of this Constitutional provision would have upon the fundamental rights of citizens and upon the overall functioning of our democratic system of government. The foundation and structure which give it life depend upon participation of the citizenry in all aspects of its operation. On patriotic occasions we hear a great deal of oratory declaiming how precious is the right and how essential is the duty to vote for the candidate of one's choice. The emphasis is placed on the first clause—the right to vote; and the second clause—for the candidate of one's choice, is minimized or forgotten. Lost sight of is the fact that the two rights are correlative, and that to make the first meaningful, the second must also be assured. Furthermore, the natural corollary of the right to vote is the right to seek and to serve in public office. Reflection on the matter will reveal that these rights are of vital importance both to individual citizens and to the public. That the framers of our Constitution so regarded them and that these rights are correlated to each other and part of the integral rights and privileges of citizenship is plainly apparent from its numerous references to 'the right to vote and hold office' in the same context.

"For the purpose of seeing these rights in clearer perspective, suppose this were a case initiated by some voter insisting upon his right to 'vote for the candidate of his choice,' or by these candidates, insisting that their rights as citizens to run for office are absolute regardless of any or all other provisions of law. They could so maintain with as much logic as the plaintiff asserts his position here. Yet, there is no question but that other provisions of law can and do limit the rights to vote and to hold office to those properly qualified. The fair and proper adjudication of those rights would have to be that the citizen could insist upon them unless for some good and sufficient reason he is actually not qualified to vote, or for the office he seeks, or he is guilty of some wrong which would justify deprivation of such rights. If he were deprived of the privilege without any such ground existing, he would be unjustly and arbitrarily deprived of a right and privilege of citizenship."

In spite of the stipulation between counsel for the parties herein, which is of record, there are some discrepancies to be noted. The respondent was a candidate in the primary election held on June 6, 1970, and ran from an area designated as Senatorial District No. 37, depicted on Exhibit "A" appended to this opinion. The area from which respondent ran in the primary is shown outlined in black lines, *including* the area marked in red. Later, in September 1970, this area was changed with the addition of the area marked in green. This obviously shows an increase in the area of representation of more than four times the original area. In addition, the total registration in Senatorial District 37 was 14,034 in the 1970 general election, and the total registration in Senatorial District 17 in the 1972 general election was

10,817. Further, seven precincts from the old District 37 were eliminated from the new District 17 at general election time in 1972. It seems obvious that the respondent was representing a significantly different group of people in 1973 and 1974 than prior to that time.

In the 1970 primary there were approximately 1,319 persons who were not allowed to vote in respondent's senate race because they were added to the district after the primary election. None of the facts shown in the above two paragraphs were referred to or shown in the stipulation mentioned above.

It is a fundamental principle of American democracy that the people shall elect their representatives in government and that said representatives shall be responsible to these persons who voted in the election for or against them. In addition, said representatives would be responsible in the electoral process to all those persons who resided in the area who could have voted in said election, were eligible and exercised their privilege. In the fact situation before us this purpose has simply been disregarded as some 4,000 persons were transferred to Senate District 20 and represented by someone other than the respondent whom they elected in 1970. See area blocked in red on Exhibit "B" appended hereto which depicts Senatorial District 17 as it was in the 1972 general election.

In the 1972 Senate Reapportionment Act, Laws 1972, ch. 79, sec. 10, we find the following:

"(1) the 1972 Senate Reapportionment Act provides in the provisional plan for a senatorial district having the same geographical boundaries as the district from which he was elected in 1970; or

"(2) the 1972 Senate Reapportionment Act provides in the provisional reapportionment plan for a senatorial district having geographical boundaries lying entirely within the geographical boundaries of the district from which he was elected in 1970. * * *"

Obviously, the above statutory provisions cannot be interpreted to mean that a senator shall remain in office when a substantial number of people who were under the respondent as constituents have been removed from that status. At the very least, the respondent should have been a candidate for his Senate seat in 1972. His service can obviously be called *de facto* in 1973 and 1974, negating any application of N. M.Const., art. IV, § 28.

Referring to art. IV, § 28, containing the phrase, "the emoluments of which were increased during such term," it is to be noted that the last change in annual compensation was made by the legislature in 1972. But from 1967 to 1972, the consumer price index rose 25.3 per cent. In addition, a district judge in New Mexico in 1967, received an annual salary of $17,500. Assuming the purchasing power of that money to be $17,500 in 1967, after the legislature granted an increase to $27,000 to the district judges, the purchasing power of the $27,000 figure was $17,430, or $70.00 less than it was five years before. (Data obtained from the American Judicature Society and the U.S. Department of Labor.)

I fail to see where the emoluments to the district judges were increased in any way, shape or form. Had the legislature failed to act as it did in 1972 it would have created a gross reduction in salaries. Further, that the raises, emoluments, or "catch-up" involved when considered in lieu of the increases in the cost of living could have induced very few if any qualified members of the bar to seek the office of district judge, but rather those persons with a sincere commitment to our judicial system are attracted to the judiciary based on strong personal beliefs rather than pecuniary gain.

Because of the rather small pecuniary benefits attached to the office of district judge very few persons seek the position

whose rewards are based on self-satisfaction through involvement with a fundamental aspect of our democratic principals. Proof of this can be seen in the number of persons seeking the office of district judge in the 1972 primary elections, the last time all district judges ran for election or re-election. In the democratic primary, in thirteen judicial districts and twenty-six judgeships, only seven of the twenty-six judgeships were contested. On the republican side, only three of the twenty-six judgeships were contested with sixteen of them having no candidate at all.

By way of comparison, twenty-five persons sought the democratic nomination for United States Senator and eight the republican nomination in the same 1972 primary election. In the United States Representative primary, six democrats and four republicans sought the two positions.

These primary elections were held after the judicial salary increase in question had been passed and signed into law. It would seem elementary that if no more than those indicated above showed an interest in seeking the office of district judge, a man of the unquestioned qualifications of respondent who had a very good law practice and served as a powerful leader in the state Senate would not have accepted the office he now holds because of the minute pecuniary gains attached to the office during his tenure as a state Senator.

The Chief Justice of the United States Supreme Court, Warren E. Burger, recently aired his views on the inadequate salaries of judges. Speaking mainly of federal judges, whose salaries are much greater than state judges, the Chief Justice pointed out in his sixth annual State of the Judiciary Address to the American Bar Association that the lack of giving judges raises since 1969 might violate "the spirit of the constitutional prohibition against reduction of salaries of federal judges during their terms of office."

The court, in Shields v. Toronto, supra, at 831, in addressing itself to the emoluments question which involved similar circumstances to those before us now, stated:

"The important fact here is that the salary increases involved could not by any stretch of the imagination be regarded as partaking of the impropriety just referred to. There are two significant points which emphasize the correctness of this conclusion. In the first place, the raises given were not directed toward the creation of, nor to the increase of emoluments of any particular office, but were part of a general salary overhaul covering executive officers and judges of the state. * * * These relatively small increases, of that character, should properly be regarded as just what they were, a moderate cost of living adjustment on an across-the-board basis in keeping with the steadily rising costs of living. Accordingly, it can be said with assurance that this is not a situation which would lend itself to any ulterior scheme by a legislator to set up a high paying sinecure to take advantage of which Section 7 of Article VI was designed to prevent. Nor is there any reasonable likelihood that such raises would have induced anyone to run for the offices in question who would not otherwise have done so. The fact that some members of the legislature aspired to the named offices is merely coincidental. This is so clear that we believe no fair-minded person would contend to the contrary. Indeed, to the credit of the plaintiff and his counsel, no contention has been made that there was any actual impropriety or ulterior purpose whatsoever in the conduct of these candidates."

In my opinion this reasoning is convincing and applicable here and the writ heretofore issued should be dissolved. The majority ruling otherwise,

I respectfully dissent.

See Appendix on next page

APPENDIX

EXHIBIT "A"

MAP SECTION I OF 2

RED      GREEN

EXHIBIT "B"

GREEN